Satish Rao
2421 Oregon St.
Berkeley, CA 94705
510-882-5324
satish0rao@gmail.com
Pro Se

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SATISH RAO,<br>Plaintiff<br>vs. Professor John Canny;<br>Dean Tsu-Jae King Liu;<br>Dean Jennifer Chayes;<br>Vice Provost Victoria Plaut;<br>Vice Provost Janet Broughton,<br>in their individual and official capacities;<br>Chancellor's Designee Sharon Inkelas,<br>in her individual capacity only;<br>Regents of the University of California; and<br>Doe Defendants 1–10 (as to Count Eleven)<br>and Doe Defendants 11–100 (as to Count Four),<br>in their individual capacities.<br><br>_______________________________________/ | Case # 3:25-cv-02385-LB<br>THIRD AMENDED<br>VERIFIED COMPLAINT<br>FOR VIOLATIONS OF<br>42 U.S.C. § 1983,<br>TITLE VII, AND FEHA |

August 3, 2026

COMES NOW Plaintiff, Satish Rao, pro se, and files this Third Amended Complaint for declaratory relief, monetary damages, costs, attorneys' fees, and any other relief to which he is entitled as a victim of civil rights violations. This is an action against Defendants John Canny, Tsu-Jae King Liu, Jennifer Chayes, Victoria Plaut, Janet Broughton, and the Regents of the University of California, under 42 U.S.C. § 1983 to address Defendants' violations of Plaintiff's First Amendment rights, procedural due process rights, and non-discrimination rights under the Fourteenth Amendment to the United States

Constitution; under Title VII of the Civil Rights Act of 1964; and under the California Fair Employment and Housing Act. Plaintiff additionally asserts Count Eleven under 42 U.S.C. § 1983 against Defendants Sharon Inkelas and Doe Defendants 1–10, in their individual capacities only, arising from the April 24, 2026 referral to the Committee on Charges.

## INTRODUCTION

1. Plaintiff is a UC Berkeley professor who has been subjected to a course of retaliation and adverse employment consequences spanning more than seven years and continuing — from 2018 through the University's April 2026 referral of plaintiff to its Committee on Charges.

2. In September 2018, Plaintiff was asked to analyze graduate admissions data correlations (GRE scores, letter scores, reviewer scores, associations with prelim exams, and other measures). To block that analysis, staff falsely accused Plaintiff of previously misusing data to exclude URMs (under-represented minorities) from Berkeley, leading Plaintiff to complain to his Chairs and Dean. A process was established with an ombudsperson and chairs in which Plaintiff prepared questions for staff, but staff refused to answer. In a "formal complaint" to the Dean, Plaintiff stated the accusations were based in part on his ethnicity, as the relevant staff person also raised concerns about another faculty member of South Asian descent while having no reservations about several faculty members of European descent.

3. **Harassment, deceleration.** Plaintiff alleges ongoing repercussions. Plaintiff's job duties changed (including committee assignments), his merit advancement was decelerated despite favorable evaluations, and he was ha-

rassed because of his speech, discriminated against based on his Indian descent (including inquiring about caste and excluding Plaintiff from committees). For example, Defendant Canny explicitly excluded Plaintiff from a committee by email due to Plaintiff's ethnicity and caste. Defendant Canny acknowledged his action "was discriminatory" and "so is racism, but also so is anti-racism." [1]

4. Deans Liu and Chayes and Vice Provosts Broughton and Plaut (in her capacity as Chair of the Budget and Interdepartmental (BIR) Committee) participated in multiple rounds of the merit-review process, endorsing Canny's actions without due process, ultimately arriving at a decision that punished Rao with a deceleration of his merit advancement and loss of good standing.

5. The latter makes Rao ineligible for good standing salary adjustments. From Exhibit 15 at 2/3, ¶1, states that faculty are eligible for this program:

- *The individual did not receive less than a full-step or equivalent advance at their last review.*
- *The individual is not decelerated in time, which means an eligible individual has had a merit action with a July 1, 2019, July 1, 2020, or July 1, 2021 effective date (even if the decision is pending) or their last action was effective July 1, 2018 and their next review will be for advancement to Above Scale.*

6. Rao had received the extra pay which at the time was $ 7,000, and the deceleration (as punishment without authority in the APM and eventually

[1] Exhibit 11 at 6, ¶5.

as retaliation for protected activity) caused Rao to suffer a decrease in pay and to pay back monies already received. Rao would have enjoyed another planned increase of $7,000 in the 2022 Salary adjustment plan which has the same language (See Exhibit 16 at 3.) Thus, Rao is losing (at least) $14,000 a year for the term of his employment (plus the impact on his retirement) in addition to the loss of the merit advancement. Had Rao simply waited to put in his merit-review papers, the loss of good standing would not have happened.

7. As a direct result of the deceleration, Plaintiff continues to be paid, in each pay period, compensation lower than he would have received had he been advanced the ordinary full step. Each such payment gives continuing effect to, and results from, the challenged deceleration.

8. The stated reasons for deceleration in the decision letters were (a) unspecified staff complaints (in both preliminary and reconsideration decisions) and (b) Plaintiff's criticisms of higher administration (in preliminary decision but left out of the reconsideration decision). The latter is an attack on Plaintiff's rights to speech, which they apparently realize as it is removed in the letters issued during the reconsideration process.

9. Only on October 11, 2024, did Deans Liu and Chayes reveal in a recorded Zoom meeting that Plaintiff's written questions—submitted in the process Dean Liu herself had set up to address Plaintiff's protected complaint—were treated as the moment the matter "escalated" and as a basis for Plaintiff's deceleration.[2] Amusingly, at this point the positions diverged: Dean

[2] The merit-review processes were so delayed that salary adjustments were given to Rao in anticipation of regular merit advancement and withdrawn with the eventual deceleration whereby Plaintiff was required to pay back monies.

Chayes acknowledged Plaintiff's rights, while Dean Liu advanced a different rationale that Plaintiff alleges was false. The recording confirms these statements.

10. The deceleration-related claims here are that the original individual defendants and the Regents, as applicable, deprived Plaintiff of his property right (an earned merit increase under the Academic Personnel Manual and by admission of the original Defendants) (a) by punishing him without authority and without affording him most basic due process right of informing him of what he had done wrong (b) in retaliation for making a protected claim of discrimination and (c) for his constitutional protected speech.

**Office of Prevention for Harassment and Discrimination retaliation.**

11. Plaintiff made complaints to the Office of Prevention of Harassment and Discrimination (OPHD) regarding (a) retaliation for his protected activity of participating in the process (b) Canny's explicit discrimination. OPHD refused to investigate retaliation as OPHD supervisor Rome pre-concludes that Levien acted in good faith. Thus, they opened an investigation into Levien (despite Plaintiff's protest) for bias rather than retaliation (which was clear and what Plaintiff requested to be investigated.)

12. Further, it opened an investigation into Chair Canny for his explicit discrimination.

13. According to the OPHD report on Levien, she referenced the "heinous things he said in an Undergrad Committee meeting" — a secondhand characterization she could not substantiate — and, per a witness account recorded in the same report, told that witness she thought plaintiff "would be biased"

and would "misuse the data." The report nonetheless found that Levien "did not call Complainant a racist," despite her continuing to make such accusations in her interviews with OPHD.

14. The OPHD report does conclude that Canny "engaged in the conduct as alleged," yet holds him harmless — crediting, for example, Canny's claim that plaintiff's protected speech was an alternate reason for the deceleration — without specifying the staff complaints at issue. As noted above, the video-recorded October 11, 2024 meeting with the Deans made clear that those staff complaints concerned the written questions plaintiff had proffered during his protected complaint.

15. Moreover in an addendum, OPHD addressed the retaliation claims, stating that Canny's punishment of Plaintiff was due to his emails even while Canny acknowledged Plaintiff's free speech rights with respect to those very emails. (See Exhibit 1, ¶ 63.)

16. Both reports also conclude that plaintiff's complaint regarding Levien's bias was made in good faith, that plaintiff was harmed, and that his initial complaint was protected activity. OPHD nonetheless declined to find retaliation, attributing the deceleration instead to plaintiff's emails — that is, to his protected speech.

17. On November 14, 2022 — eleven days after the November 3, 2022 Notice of Outcome declining to hold Canny and Levien responsible — OPHD opened an investigation into plaintiff that had no basis, as the investigator ultimately concluded. Because OPHD investigates only approximately six percent (6%) of complaints, plaintiff alleges that this investigation was it-

self retaliation by OPHD for his complaints to OPHD, which are protected activity.

18. Defendant Plaut, as Vice Provost for the Faculty and supervisor of OPHD, made the final institutional determinations on the OPHD investigations months after the reports were issued, with full knowledge of Plaintiff's responses to the investigations.

19. The claim here is that OPHD pursued a retaliatory investigation of Plaintiff in response to his complaints which themselves were not properly adjudicated.

***Conspiracy and continued harassment.***

20. Plaintiff further alleges conspiracy for the defendants in the merit-review process as described above and the abuse of Plaintiff's rights as an employee continues.

1. Chair Canny suggested Vice Provost Eugene Whitlock (in charge of human resources) passed along staff complaints to him. Whitlock refused to share those complaints with Rao, referring him to Canny, who also refused to say what they were even while punishing him for them.

2. As noted below, when OPHD pursued a retaliatory investigation against Rao, the complainant was a student in EECS; on information and belief, staff and/or faculty encouraged the complaint to OPHD through a complaint form managed by staff.

3. During the merit-review process, Plaintiff asked subsequent Chair David Wagner not to forward Canny's false and defamatory departmental recommendation because it was retaliatory. Wagner noted that Campus Counsel

David Robinson explained retaliation was ‘ok’ in certain circumstances, and he consulted with Karie Frasch of the Office of Faculty Equity and Welfare. On that advice from Robinson and Frasch, Wagner forwarded Canny’s recommendation despite his knowledge of Canny’s discriminatory behavior and the lack of specifics for punishment.

4. In 2024, Counsel Robinson intervened inappropriately in student conduct cases, dictating the Student Conduct Office’s conclusions and meeting with Chairs Jelani Nelson and Claire Tomlin to pressure Rao to change the grade. Under Regental policy, grades are reviewable only by the Academic Senate, which found plaintiff awarded grades appropriately. The process cost Plaintiff months of extra work and stress and exposed him to abuse by the students during the process.

5. While the university provided Plaintiff his employment file, it asserted the records were university property that Rao could share only in a limited manner. Plaintiff requested the record under the California Public Records Act (CPRA); statute and precedent make such records freely available to the employee, but Campus Counsel David Robinson, on behalf of UC Counsel Charles Robinson, reasserted the prohibition as policy despite understanding it violated the law. Following another faculty’s complaint to the Public Employees Relations Board (PERB), the illegal policy was withdrawn.

6. Plaintiff continued to be isolated, e.g., serving on a committee of one, albeit with substantive workload, until Fall 2025.

7. The “Guidelines for Preventing and Responding to Faculty Bullying” were written by EVCP Hermalin while he was Vice Provost for the Faculty. They are not official University policy: they are not part of the Academic

Personnel Manual, and they recite only that they were "issued after consultation with the Academic Senate" — and never claim to have been officially approved by any Academic Senate committee at the Berkeley or University level. Interim Vice Provost Broughton nonetheless relied on them in Plaintiff's matter.

Judicial relief is required given UC Berkeley's illegal behavior with respect to Plaintiff's legal rights as an employee. Even Dean Chayes acknowledges that Plaintiff's legal rights as an employee should be respected in the recorded meeting of October 11, 2024. If only she and the other defendants had done so. Indeed, the video indicates that she and Dean Liu understood that Canny explicitly deprived Rao of a position due to his Indian ancestry and caste.

***Property Interest.***

At Berkeley, salary adjustments are periodically given to those in good standing, and Rao had received such a raise while awaiting his merit-review process. All reviewers agreed he met the conditions for a regular step increase under APM-220; the only reason for the deceleration was the false, unspecified accusation regarding harassment of staff, which turned out to be an allegation made in retaliation for Rao's protected activity. When the deceleration was decided, Rao lost his "good standing" pay: after the half-step advance his total salary decreased and he had to repay monies he had received, since the presumption was that all in-progress reviews would be normal. In particular, the 2021 and 2022 programs would have added $14,000 to his yearly salary regardless of his merit advancement. One's rank is also perhaps protected: at Berkeley the step system functions as rank, beyond mere titles, and advancement through steps is regular, expected progress —

akin to within-grade step increases on the federal General Schedule (GS) pay scale.

***Summary.***

Staff made false accusations about what Rao said at an undergraduate study meeting (with perhaps 20 attendees); after Rao complained, defendants retaliated with explicit ethnicity- and caste-based discrimination, attacks on his speech, and false allegations of mistreating staff, causing loss of merit advancement and salary, isolation, and harassment. OPHD then retaliated against Rao for making protected complaints to OPHD itself, all as documented in the record.

**Jurisdiction and Venue**

21. This court has original jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this is an action to redress the deprivation of rights secured by the Constitution and laws of the United States and the Civil Rights Act of 1964. Plaintiff seeks remedies under 42 U.S.C. 1983 and 1988.

22. This Court has jurisdiction to issue injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 1983.

23. Venue is proper in the US District Court of the Northern District of California, pursuant to 28 U.S.C. § 1391(b). All events or omissions giving rise to Plaintiff's claims occurred in the County of Alameda, CA.

PARTIES

**Plaintiff**

24. Plaintiff, Professor Satish Rao, at all times relevant to this Complaint was and is a Professor at the University of California, Berkeley.

**Defendants**

25. Defendant John Canny who was Chair of the Computer Science department during portions of time relevant to this complaint.

26. Defendant Tsu-Jae King Liu was, at times relevant to this complaint, Dean of the College of Engineering. Liu ran the process regarding staff's defamatory behavior, and recommended deceleration in Rao's merit-review processes including the initial evaluation and the reconsideration that finalized the resulting deceleration.

27. Defendant Jennifer Chayes was Dean of the College of Computing, Data Science and Society during relevant portions of this matter. Chayes recommended deceleration in Rao's merit-review processes including the initial evaluation and the reconsideration that finalized the resulting deceleration.

28. Defendant Janet Broughton was Interim Vice Provost during Rao's merit-review process, in both the initial review and reconsideration, and ultimately decelerated Rao.

29. Defendant Victoria Plaut was Chair of the Budget and Interdepartmental Committee and Vice Provost of the Faculty during times relevant to this Complaint.

30. Defendant Sharon Inkelas is the University's Deputy Chief Ethics, Risk, and Compliance Officer and served as the Chancellor's Designee who issued the April 24, 2026 Notice of Allegations and Referral of Plaintiff to the Com-

mittee on Charges. She is sued in her individual capacity for damages under 42 U.S.C. § 1983.

31. Defendant The Regents of the University of California is the constitutional corporation that operates the University of California, including UC Berkeley, and is the institutional defendant in this action.

## Statement of Facts.

32. We present a small subset of the facts in a voluminous record in this section to establish entitlement for a claim for relief. In particular, we focus on (a) the employment harm of deceleration engendered by violations of Rao's First Amendment, Fourteenth Amendment Rights, Title VII, Title VII retaliation, Equal Protection (Section 1983), Due Process (Section 1983) and FEHA (b) the retaliatory investigations by OPHD (c) conspiracy and continuing violations where the record most requires discovery.

*Initiating Event and Protected Activity.*

33. In December 2018, Staff made false and defamatory statements (according to Grad Matters Chair John Wawrznyek) that Rao has misused data to argue that URM (underrepresented minorities) should not be admitted to UC Berkeley. They did this to argue that Rao should not be allowed to analyze data around graduate student admissions. See Exhibit 6 or Exhibit 1, ¶ 6.

34. In December 2018 through January 2019, Rao complained to then-Dean Tsu-Jae King Liu. A complaint-resolution process was conducted by Chairs Jim Demmel and Jeff Bokor, with the participation of Faculty Ombudsperson Christine Parlour.

35. On February 25, 2019, Demmel, Bokor, Parlour, and Rao agreed that questions should be proffered to staff regarding their allegations. The questions were formulated by Rao and Parlour and given to staff in or about March 2019. The questions asked staff (a) whether they did make the statements attributed to them, (b) on what evidence, and (c) allowed for explanation. The questions are in Exhibit 7.

36. May 24, 2019. Rao meets with Chairs Demmel and Bokor (without Ombudsperson Parlour) and said staff would not answer the questions and were hostile to Rao. See ¶ 17 in Exhibit 1.

37. July 15, 2019. Rao sent a "formal complaint" — a term Dean Liu likewise used for it — to Dean Liu raising his belief that staff's defamatory statements were in part due to his South Asian ancestry. Specifically, the relevant staff person raised objections to another faculty of South Asian ancestry, while having no issues with 5 other faculty. OPHD later finds Plaintiff raised this issue in good faith, offering further support that his complaint is protected activity.

38. August 2019. In her response closing Rao's July 15, 2019 formal complaint, Dean Liu concluded that the staff had taken "appropriate action," stated she did "not see cause for serious concern that anyone is spreading rumors that you are a racist," and closed by expressing the "hope that you will view the staff as co-workers who play important roles to help ensure the success of the department." Addressed to the faculty member who filed the complaint, that closing reframes Rao — rather than the accusing staff — as the party who must be reminded to value staff, and helps set up the later deceleration premised on his protected complaint. Specifically, the staff were

upset by the questions offered by Rao and Parlour and delivered by Chairs Demmel and Bokor.

**Chair Canny's discrimination, attacks on speech, and recommendation for deceleration.**

39. Sept 2019: Chair Canny declined to reappoint Plaintiff to the Undergraduate Study Committee, gave no reason when asked, but later told OPHD he acted based on unspecified staff complaints eventually revealed to be regarding the written questions submitted by Rao and Ombudsperson Parlour; on July 13, 2021 he then recommended deceleration without providing specific, timely reasons.

40. On April 21, 2021, Chair Canny sent Rao a document with hundreds of pages of emails which were marked up. The emails largely discuss public and university policy such as the use of remote proctoring, the diversion of funds to the administration from teaching, the use of the GRE, and other topics. Rao followed up to Chair Bokor complaining this was harassment, and Chair Canny desisted. Later in interviews with OPHD, Canny indicated these emails were part of the reason he argued for deceleration for Rao.

41. Sept 11, 2020 (Equity & Inclusion committee): Rao asked to serve on the Equity & Inclusion (Anti-Racist) committee, citing four years of work on achievement-gap initiatives at Berkeley High. Canny noted that he didn't want an Indian member specifically one from the caste Rao is presumed to be from. Canny specifically used the word "majority" for Indians. Rao noted he was American who grew up in the Deep south and as such had broad experience as a minority. Moreover, Rao noted that this was inappropriate and that Canny should give him a non-discriminatory reason to exclude him.

Canny noted “Yes, it was discriminatory. So is racism, but also so is anti-racism”.

42. Notably the committee consisted primarily of people of European descent; upon information and belief, at some point it was entirely “white”: Armando Fox, Chair Canny, Claire Tomlin, and Sarah Chasins. The department faculty is majority “white,” not South Asian. A South Asian who had worked on related issues at Berkeley High might have offered useful perspectives, but Canny excluded Plaintiff explicitly in writing based on Plaintiff’s ethnicity, despite Plaintiff’s near-pleading not to do so.

**Departmental Merit Review: due process, retaliation, discrimination.**

43. The merit-review process proceeds with a self statement by the candidate, a departmental recommendation by the Chair, a response by the candidate, a review by the Dean(s), a review by the Budget and Interdepartmental Relations (BIR) committee, a decision by the Vice Provost for Faculty, who communicates back to the Deans, who finally communicate to the candidate’s chairs. The evaluations must adhere to the standards set out in the Academic Personnel Manual §§210 and 220.

44. October 26, 2020. Rao submitted his materials.

45. July 13, 2021. Chair Canny’s (much delayed) departmental letter states Rao’s research output is low, but his more than double teaching load compensates for it. In particular, it states his teaching “is of tremendous value to the department, especially given that Rao has shown great flexibility in the courses he is willing to teach, often filling ’holes’ where there is no other

instructor available. He has also delayed sabbatical leaves in order to cover these courses." Moreover, it states that the work he does in service is substantial and done with diligence. However, it makes various allegations regarding behavior with no specifics and as such unrebuttable. In his testimony to OPHD, Chair Canny accused Rao of having "racist thinking" in part by stating that Rao gave a "racist assignment."

46. Sept 20, 2021: Rao sent a google form with questions to Chair Canny regarding the departmental recommendation, and to former Chairs Bokor and Demmel. Bokor (for himself and Demmel) declined to respond.

47. Canny's largely was non-responsive but for one question he states: "Three staff members reported such incidents which involved verbal intimidation, threats of reports to campus committees, and allusion to legal action." These are false statements. As later revealed by Dean Liu, the offense was the questions proffered by Rao during his protected activity. Indeed, Rao was never alone with the relevant staff during the period — previous Chairs were told to attend meetings when staff were present, and Rao himself avoided unsupervised interactions with them. He did so because he believed, and continues to believe, that they had made false accusations about him, that those accusations were repeated or preserved through University processes, and that further interactions would generate additional accusations. Subsequent University proceedings reinforced rather than dispelled that fear.

48. Canny states that Rao's interaction with staff: "This substantially interfered with these staff's ability to perform their duties, and on their willingness to continue to serve on those committees. The details of these interactions will not be recounted here, but they have been repeated by a large

number of staff and occurred in both private and public situations (i.e. in committee meetings witnessed by many faculty and staff).” There are no details here at all. Indeed, as noted, the reason staff appear to be angry is their fear of being sued for their false and defamatory statements about Rao. Indeed, Dean Liu confirms in the October 11, 2024 recorded meeting that the questions Rao proffered in the complaint about staff is the actual specific complaint.

49. Rao prepared a statement in response to Canny’s departmental recommendation that included information about Canny’s explicit discrimination, the lack of specifics, the attack on his speech, and the process around the false accusations by staff.

50. January 30, 2022. The Dean Chayes (with concurrence by Dean Liu) writes:

“I believe his contributions support a normal one-step merit at this time. However, the case materials do demonstrate that his actions created a hostile work environment, which, in accordance with your August 1, 2019 Guidelines for Preventing and Responding to Faculty Bullying and Other Demeaning and Disruptive Behavior, should have bearing on how we assess our faculty’s performance during any given review period. Therefore, I concur with the department’s recommendation...”

Notably, they reference “Guidelines for Preventing and Responding to Faculty Bullying and Other Demeaning and Disruptive Behavior,” which are not part of the APM. Faculty discipline belongs to the Committee on Privilege and Tenure, with substantive due-process protections under the Academic Senate Bylaws — none of which the APM-210 merit-review process provides.

Yet the Guidelines themselves state:

*"... assessments of poor performance arising from the candidate's bullying or demeaning behavior towards others should be properly documented ... such that the candidate ... can offer a rebuttal, explanation, or provide context..."*

The offending behavior was never documented for years. And when it was, it is not offending and indeed was protected activity.

51. The next step is the BIR committee.

52. June 23, 2022. The BIR committee which itself evaluates Rao's research as "good" (i.e., in contrast to Chair Canny) but repeat the Deans accusations that Rao created "a hostile environment." Moreover, it adds the accusation that Rao "Moreover, we do not find it appropriate for him to continue leveling charges and making personal attacks at various members of the academic administration stemming from professional disagreements with departmental policies and decisions". It identifies no such attack, and indeed is an attack on Rao's academic freedom as in general his complaints about academic administration is that they siphon funds away from teaching or other matters of public concern. It endorses Rao's deceleration.

53. The next step is the Vice Provost Broughton who first notes that an allegation of establishing "a hostile environment" requires an investigation. Then she as do the others endorse the punishment citing the "Guidelines for..." as an authority. Again, this reads into APM 210 something that is not there, and also ignores the requirements set out in the "Guidelines..." themselves. Vice Provost Broughton also endorses the allegation that Rao

attacks the academic administration without specifics, thereby chilling Rao's First Amendment speech and the particular Ninth Circuit protections for discourse on academic governance. Moreover, upon information and belief, this demonstrates Broughton's understanding that due process is important for those facing allegations.

54. August 5, 2022. Lastly, the Deans receive the decision and they restate the allegations both regarding the staff and regarding Rao's supposed attacks on academic administration.

55. The reconsideration part of the process proceeded similarly where the Deans, the Provost, and the BIR simply reiterate their previous statements while dismissing Rao's request for specifics without addressing them. The BIR Reconsideration Letter itself recorded plaintiff's averment that the deceleration was "due to false accusation of harassment and bullying" and that there "remain no specifics on what that harassment or bullying is," and his argument that his deceleration "was decided without due process or specific authority from the Academic Personnel Manual (APM)," yet it reiterated the deceleration without providing those specifics. They do, however, remove the complaints regarding attacks on academic administration as, upon information and belief, they realize the serious issues with interfering so bluntly with academic freedoms.

56. Notably, reconsideration is required for finality before Rao could pursue a Grievance with the Committee on Privilege and Tenure as the decision is not considered a final one until then. The Committee on Privilege and Tenure holds hearings and as such is considered quasi-judicial in California. *See Mendoza v. Regents* (1978) 78 Cal.App.3d 168, 177 (University exer-

cises adjudicatory powers derived directly from the California Constitution, reviewable by administrative mandamus under Code Civ. Proc. §1094.5).

**Office of Prevention of Harassment and Discrimination.**

57. Here, we refer to Exhibit 1, ¶ 48-89 which discusses the investigation of Canny.

1. In Exhibit 1, ¶ 52-58, attempts by Rao to have OPHD investigate retaliation with respect to Levien as opposed to discrimination are rebuffed by OPHD Supervisor Elizabeth Rome even while Investigator Martha Phillips appears receptive.

2. In Exhibit 1, ¶ 60-64, OPHD clears Canny of violations despite finding he did do what was alleged, i.e., told Rao he was discriminating against him. He explained to the investigator that "the majority of faculty in EECS are Indian or of Indian descent" — the group to which plaintiff belongs. He further admits Rao's speech is protected but also states that the real reason for the committee assignments is not staff complaints, but Rao's speech.

3. In Exhibit 1, ¶65-73, Canny reveals that being informed that Rao "harassed staff" he removed Rao from committees in contrast to OPHD conclusions. Thus, he did indeed retaliate.

Again, there is no specific accusation or finding of harassing staff during the period by anyone including OPHD who interviewed many relevant staff members and other staff members in this investigation as well as that of Levien.

4. Regarding interactions with staff, OPHD reached back many years — to two trivial, long-resolved incidents, one of them predating the relevant

period by nearly a decade — and used them to claim a “pattern” supporting the charge of poor staff interactions. OPHD concludes

*Further, Witness One, Witness Two, and Witness Three recounted instances of Complainant’s unprofessional conduct unrelated to the issue between him and EECS Staff and that were known to the department leadership.*[3]

Rao deals constantly with staff over decades; he runs courses with hundreds of students, dozens of course staff, and works with department staff in hiring, scheduling, and numerous other aspects of the courses. As scheduling officer for a half dozen years, he worked with staff in hiring teaching staff as well as in assigning faculty teaching. Reaching back decades with scant detail to find friction is what this is.

5. Also, in the OPHD investigations, faculty are interviewed. The only complaint that is specific about Rao:

*When asked what specific opinions Complainant shared, Witness Seven said university under-funding of the budget that pays the teaching assistants. He said the issue is long-standing, and he and other faculty don’t disagree with Complainant. Witness Seven said he and other faculty try to shut down that discussion thread in faculty emails because they don’t want to spend so much time on this issue.*[4]

Research is insanity, Rao keeps working on problems he fails to solve. Sometimes for decades. The diversion of funds away from teaching is a compelling issue which Rao continues to work on despite repeated failures. And for the record, faculty are welcome to ignore discussions on the email list devoted to discussion and often do. Rao doesn’t recall peers shutting down such discus-

[3]Exhibit 5b at 55 ¶4.
[4]Exhibit 5b at 31 ¶2.

sions. Other specific examples of problematic behavior by faculty members — aside from Defendant Canny's mischaracterizations, discussed later in this complaint — are absent from the OPHD reports despite interviewing many faculty.

6. Indeed, the only relevant incident to Rao's deceleration involves the staff members who made false and defamatory statements and indeed it is worth repeating that Dean Liu specifically states the reason for Rao's deceleration were the questions that Rao and Parlour wrote which were delivered by the Chairs. This is protected activity first, and not detailing the reasons to Rao in the rather involved merit-review process (which as required by the Berkeley implementation of APM 210 involves five stages of review in the first pass, and three more in the reconsideration) was denying him due process. Not telling Rao this or any specifics denies his right to know the charges. Thus, there is simply nothing in the record that supports the vague charges that Rao was mean to staff and thus should be decelerated. Again, Dean Liu's October 11, 2024 statement identified the questions as the basis and, upon belatedly recognizing the problem, began a pretextual search for other reasons. (See Exhibit 2.)

7. Also in the OPHD report, as cited Exhibit 1, ¶ 65-73, Canny justifies accusations against Rao of "racist thinking" based on false statements about an incident that happened in one of Rao's classes. He acknowledged to OPHD investigators that emails of plaintiff's that he had marked "unprofessional" "may be protected by free speech" — that is, by the First Amendment. There are more misleading and dishonest statements there, but we leave that background for now.

58. We discuss the OPHD report in Exhibit 1, ¶ 75-80.

1. Here, Levien denies saying Rao is biased but instead claims Rao "said some outrageous things about out [sic] our Black students" during an Undergrad Studies Committee meeting — while admitting she "was not present when these remarks were made," that she heard of them only secondhand from another staff member some "three-and-a-half" years earlier, that she could not recall the specific comments, and, asked whether plaintiff "used derogatory terms when he talked about the Black students," answered only "That was my sense of it." She recalled the source staff member indicated Rao "didn't have a favorable opinion of our Black students," and Levien said she did not know whether that opinion was based on the students. Asked whether she recalled anyone discussing Rao's previous presentations, Levien replied, "No. Just [the] heinous things he said in an Undergrad Committee meeting." These secondhand accusations are false: the Undergraduate Study Committee meeting had many attendees, and Black students and URMs were not discussed at all. There is no evidence that Rao makes such statements about anyone based on ethnicity.

2. The report's conclusions do not sit easily with the record it compiled, and fail in two respects. First, even if Levien did not herself use the word "racist," OPHD went further and found "no evidence that [she] used words to imply Complainant is racist." Yet the extreme accusations she voiced in the investigation — that plaintiff had said "outrageous" and "heinous" things about "our Black students" and "didn't have a favorable opinion" of them — imply exactly that.

3. Second, OPHD found that Levien "did not assert that Complainant was

biased" — but she did, in that very word. In December 2018 Levien told Professor John Wawrzynek — the faculty member who had asked plaintiff to conduct the admissions-data analysis — that plaintiff was "biased" and would "misuse the data." Wawrzynek recorded her words in a timeline he provided to the Dean at the time (Exhibit 6), and in his OPHD interview attested that he had written it contemporaneously, not years later for the investigation; OPHD found his account "seemed fair and reliable." Levien thus asserted, in so many words, the very bias the report says she never asserted — and an accusation that plaintiff would "misuse the data" to disadvantage underrepresented minorities asserts as much in any event. On the record OPHD itself compiled, neither finding survives.

4. Upon information and belief, the fact that the report content is not consistent with the conclusions suggests that the investigator did her job, but the conclusions were directed by her supervisor, Elizabeth Rome, who had concluded that Levien was acting in good faith prior to the investigation.

5. Again, Rao never sought to have Levien investigated for bias — only for retaliation. Responsibility for that lay with Dean Liu, who never warned Levien against retaliating for Rao's complaint. Instead, in her January 27, 2020 letter closing the investigation of that complaint, Liu announced that she had "asked Jeff [Bokor] to explain the important role of staff members on departmental committees" — a non-sequitur, in response to a retaliation complaint, that recast the complaining faculty member as the problem and seeded the ground for staff to complain. Then, as the matter was escalated by Canny, Liu endorsed Rao's punishment on the strength of that retaliation, retreating only at the October 11, 2024 meeting. There, Dean Chayes

acknowledged, “I know I heard her say it,” confirming that Liu had tied the deceleration to Rao’s participation in the process; affirmed that Rao, as “an employee of the State of California,” had “the right” to pursue legal remedies (“Of course you have the right”); and then recast Dean Liu as having “misspoke[n].” (See Exhibit 2; Oct. 11, 2024 Certified Tr. 53:5–19, 54:8–9.)

59. On December 7, 2022 Rao responded to the reports with these concerns regarding Canny and on March 30, 2023, Plaut found no policy violations.

***OPHD Retaliation.***

60. In exhibit 1, ¶ 83-89, the allegation is discussed. Basically, that Rao awarded an incomplete grade to a male student where that was not offered to the female complainant. The female complainant asked for a certain grade in order to get into the major and that is the grade she received. It would make no sense to award her an incomplete grade. There is nothing to investigate, yet Rao was investigated. During the investigation Rao refused to share specific exculpatory records of female students whose circumstances were such that Rao awarded incompletes. The investigator repeatedly asked and Rao repeatedly refused as the investigation file is available to the complainant and that would violate FERPA. The investigator by acquiring records from the registrar concluded (a) there is no pattern that suggests Rao differentiates by gender (b) that there was no harm at all to the complainant as she got the grade she requested. Upon information and belief, only 6% of complaints are investigated. That this complaint was pursued at all, by an organization whose management was hostile to Rao, supports an inference of retaliatory motive.

61. The complainant may have been angry when Rao explained that grades

are earned, not given. That is understandable. But anger is not harm, and the complainant received the requested grade. Rao nevertheless was investigated.

62. Also there is a department form where students submit complaints which are processed by staff. Upon information and belief, staff may well have encouraged the student to complain to OPHD, as otherwise this makes no sense. Rao will seek discovery with regard to that complaint.

## NEW FACTUAL ALLEGATIONS — THE APRIL 24, 2026 DISCIPLINARY REFERRAL

63. **The April 24, 2026 Notice.** On April 24, 2026, UC Berkeley's Deputy Chief Ethics, Risk, and Compliance Officer Sharon Inkelas issued a Notice of Allegations and Referral to Committee on Charges concerning plaintiff. The Notice acknowledges that the underlying allegations "were reported to several campus offices in 2024" — long before the April 24, 2026 referral. The Notice sets forth three allegations, all concerning plaintiff's 2024 interactions with a student in a course he taught (identified herein as "Student A" to protect the student's privacy) and an individual plaintiff believed to be Student A's tutor: (1) that plaintiff "sent at least one spoofed email, posing as a tutoring service, to [Student A]'s personal email address, in an attempt to induce [Student A] into admitting that [the student] had cheated on the final exam by consulting with a tutor," which the Notice asserts could violate Faculty Code of Conduct (APM-015) section II.A.5 ("Use of the position or powers of a faculty member to coerce the judgment or conscience of a student or to cause harm to a student for arbitrary or personal

reasons"); (2) that plaintiff "disclosed to an individual whose identity was unknown to [him], but whom [he] believed to be the tutor in question, confidential academic and conduct information about [Student A]," and "required students taking the in-person final exam to share their student ID numbers ... with students in neighboring seats," which the Notice asserts could violate the federal Family Educational Rights and Privacy Act (FERPA), PACAOS section 130.00, and Faculty Code of Conduct sections II.A.1.c ("significant failure to adhere, without legitimate reason, to the rules of the faculty in the conduct of courses ... or to hold examinations as scheduled") and II.C.8 ("Serious violation of University policies governing the professional conduct of faculty"); and (3) that, "after the Center for Student Conduct (CSC) had concluded its investigation and determined there was insufficient evidence to support [plaintiff's] allegation that [Student A] had cheated on the final exam, [plaintiff] offered [Student A] a higher grade in exchange for [the student's] admission of cheating," which the Notice asserts could violate Faculty Code of Conduct sections II.A.1.d ("evaluation of student work by criteria not directly reflective of course performance") and II.A.5.

64. **The allegations as charged.** The Notice sets out its allegations in summary form, without the underlying evidence or supporting detail, rendering them difficult to evaluate in full at this stage. Even accepting the allegations as stated, however, they do not on their face appear to establish violations of the policy provisions the Notice invokes. The Notice further omits material context within the University's own knowledge — including that the grade at issue was reviewed on full appeal through the Academic Senate's grade-appeal process and left undisturbed (see ¶ 66) — such that

the charging document identifies no impropriety in plaintiff's assignment of a failing grade. Plaintiff reserves his full response to the allegations for the Committee on Charges process.

65. **Prior knowledge without referral.** UC Berkeley had knowledge of the conduct described in the Notice for a substantial period — the incidents were reported to one or more campus offices in 2024 — prior to the April 24, 2026 referral. UC chose not to refer the conduct for formal disciplinary proceedings during that period. The referral was issued only after plaintiff transmitted communications to defendants concerning resolution of this federal action.

66. **Connection to previously-pleaded conduct, and the Academic Senate's prior determination upholding the grade.** The conduct described in the April 24 Notice concerns the same student-conduct and grade matters in plaintiff's course in which Campus Counsel David Robinson previously intervened in 2024, as already alleged in this complaint (incorporated from the SAC). Grading determinations at the University are made by the faculty, not by the Center for Student Conduct: as the Center for Student Conduct itself confirmed to plaintiff in writing, "[a]ll grading determinations are made by the faculty or instructor of record for the specific course," and the Center "has no formal role in the grade appeal process." The grade was reviewed through the Academic Senate's grade-appeal process — in which the student filed an appeal, plaintiff filed a response, the student filed a reply, a department ad hoc grievance committee made a recommendation, and the Committee on Courses of Instruction (COCI) rendered the final decision. In that final decision, COCI "did not find sufficient evidence of improper aca-

demic procedure that affected [the] grade" and accordingly "denied the recommendation of the ad hoc grievance committee, and the grade in question [would] remain unchanged" — that is, on full review through the Academic Senate's grade-appeal process, the failing grade plaintiff had assigned was left *unchanged*, and the ad hoc grievance committee's recommendation — which had treated the Center for Student Conduct's determination as one that had to be followed — was denied. The April 24 Notice does not address or acknowledge COCI's determination leaving plaintiff's grade undisturbed.

67. **The Notice charges without disclosing material facts in the University's possession.** The Notice presents its allegations without disclosing or accounting for material facts, within the University's own files, that bear directly on them. For example, as to the grade, the Notice does not disclose that the grade was reviewed through the Academic Senate's grade-appeal process and *upheld*. The student received a failing grade that the Committee on Courses of Instruction — the body with authority over the matter — reviewed on full appeal and declined to disturb (¶ 66). The University's files on this matter — including the grade-appeal record, the Center for Student Conduct file, and the grievance-committee record — contain further material facts of similar exculpatory character bearing on each of the three allegations, which the Notice likewise does not disclose or address.

68. **Designee structure and conflicts.** Under UC Berkeley's procedures, the Vice Provost for the Faculty is the institutional officer responsible for academic-personnel disciplinary matters. The Notice acknowledges that "the Vice Provost is recused from the case." The recused Vice Provost is Defendant Victoria Plaut, a named defendant in this action. UC selected

Sharon Inkelas to serve as Chancellor's Designee in Plaut's place. Inkelas has her own documented conflicts with plaintiff's matter, including prior supervision of Karie Frasch (a witness in this action) and prior involvement in directing reconsideration of plaintiff's deceleration. The institution has not identified any other University official without conflicts who could serve as Designee.

69. **Receipt by the Vice Provost's office in 2024 and the routing to Inkelas.** The Notice states that the allegations were "reported to several campus offices in 2024 and subsequently forwarded to the Vice Provost for the Faculty for assessment." The Vice Provost for the Faculty is Defendant Victoria Plaut. On information and belief, the Office of the Vice Provost for the Faculty — Defendant Plaut's office — received the allegations in 2024, and the matter remained within the University for a substantial period before the April 24, 2026 referral. Plaintiff filed this action on March 7, 2025. The University has not disclosed when the Office of the Vice Provost for the Faculty received the allegations, who decided to forward the matter to the Committee on Charges, or when or why that decision was made — including why a matter reported to the University in 2024 was referred only in April 2026, after the Court's favorable ruling on defendants' motion to dismiss and plaintiff's settlement communications, and how the matter came to be routed from Defendant Plaut's office to Inkelas.

70. **The recusal request and denial.** On April 29, 2026, plaintiff sent a written request to Inkelas requesting (a) that she recuse herself as Chancellor's Designee; (b) that an unconflicted successor designee conduct an Intake and Initial Assessment under Section V.A of the UC Berkeley Procedure

for the Resolution of Senate Faculty Misconduct Complaints, including contacting plaintiff as the Respondent; (c) that the successor designee give due consideration to Section V.C.1 (Administrative Closure with possible preventive education) before initiating any formal investigation under Section V.C.2; and (d) that records, communications, and notes related to the matter be preserved and an appropriate litigation hold implemented. A true and correct copy of plaintiff's April 29, 2026 recusal request is attached as Exhibit 24 and incorporated herein by reference. Plaintiff identified specific grounds for recusal, including (i) Inkelas's prior advice to plaintiff that he was required to undergo reconsideration of his merit-review action before bringing the matter to the Privilege & Tenure Committee — a direction that is part of the procedural sequence at issue in this federal case; (ii) Inkelas's pre-2023 supervisory relationship with Karie Frasch, identified as a witness in plaintiff's Initial Disclosures in this federal case; and (iii) the timing of the present referral relative to federal-litigation milestones, including plaintiff's written settlement letter approximately three weeks earlier and the Court's favorable ruling on defendants' motion to dismiss approximately one month earlier. On May 1, 2026, Inkelas responded. Inkelas declined recusal as to the first ground on the basis that, in her judgment, "having, in the past, provided information about the merit and promotion process does not create a conflict of interest in the present unrelated matter" — characterizing her prior reconsideration involvement narrowly and characterizing the present matter as unrelated to the matters at issue in this federal case. Inkelas declined recusal as to the second ground on the basis that, in her judgment, "the fact of a past (pre-2023) supervisory relationship with someone who may be a witness in a different matter has no impact on my role in the present matter."

With respect to plaintiff's request that an Intake and Initial Assessment be conducted under Section V.A, including contact with plaintiff, Inkelas stated that an Intake and Initial Assessment "was conducted in alignment with the Procedures, which do not require an interview with the Respondent." Inkelas did not identify the participants in, scope of, or factual record before, the asserted Intake and Initial Assessment that was conducted without plaintiff. Inkelas did not address plaintiff's request for consideration of Section V.C.1 (Administrative Closure with possible preventive education) before formal referral, despite the Procedure's express authorization of Administrative Closure with possible preventive education as a resolution path. Inkelas confirmed that document preservation related to the matter "is standard practice."

71. **The Committee on Charges.** The Notice refers the matter to "the Academic Senate's Committee on Charges." The Committee on Charges is a special committee of the Divisional Council originally established in October 2020 for a two-year authorization period ending Spring 2022. The Committee was thereafter re-authorized for successive two-year terms: on April 15, 2024, "through Spring 2026," and again, upon information and belief, on or about April 7, 2026, "through Spring 2027" — the most recent re-authorization occurring approximately seventeen days before the April 24, 2026 referral.

72. **The Committee's procedural framework.** The institutional document governing the Committee on Charges, as posted on the Academic Senate's public website, is a "Special Committee Brief" dated October 19, 2020, drafted for the original two-year authorization period that ended in Spring 2022. No updated procedural framework has been posted for the current

authorization period. The 2020 framework contemplates standing membership of at least eight Senate faculty, automatic conflict-of-interest screening, written intake from the Vice Provost for the Faculty, pool-based assignment of investigators per case, and a draft-report-for-comment procedure.

73. **The Committee's current membership.** As of May 22, 2026, the Academic Senate's public roster for the Committee on Charges lists no committee members. The only individual identified on the public Committee on Charges page is Senate Analyst Patrick Allen, who serves as staff support.

74. **Plaintiff's procedural inquiries.** On May 7, 2026, plaintiff requested procedural information from Patrick Allen regarding (a) Committee composition, including the chair and any process for disclosure of potential conflicts of interest; (b) anticipated timeline from referral to Committee determination; (c) opportunity for the named faculty member to submit a written response or otherwise be heard; (d) the standard the Committee applies in evaluating allegations; (e) what materials the Committee has received; and (f) the appropriate channel for procedural communications going forward.

75. **The response and continued non-disclosure.** On May 11, 2026, Allen acknowledged receipt and stated: "The case is new, and the Committee has yet to form and work on it." As of May 22, 2026, no substantive information regarding Committee composition, conflict-screening processes, applicable standards, anticipated timeline, or materials before the Committee has been provided to plaintiff.

76. **The Notice's substantive irregularities.** The Notice cites Faculty

Code of Conduct provisions that do not fit the conduct alleged: section II.A.5 (misuse of position to "coerce the judgment or conscience of a student") is invoked for conduct concerning a suspected-cheating investigation, and section II.A.1.c (governing classroom administration — meeting class, keeping office hours, holding examinations as scheduled) for an alleged protected-information violation. The Notice then adds the residual section II.C.8 ("Serious violation of University policies governing the professional conduct of faculty") alongside the specific provisions, signaling the institution's own uncertainty that those provisions apply.

77. **The intake process and absence of plaintiff's participation.** Under Section V.A of the UC Berkeley Procedure for the Resolution of Senate Faculty Misconduct Complaints, on receipt of a complaint the Vice Provost "may contact the Reporter, the Respondent, and the Complainant(s)" to develop sufficient information to determine whether the allegations, if true, would violate the Faculty Code of Conduct (the prima facie standard). Section V.C.1 authorizes Administrative Closure with possible "preventive education" as a resolution; Section V.C.2 sets forth the alternative of formal investigation. The Designee (Inkelas) proceeded directly under Section V.C.2 — without contacting plaintiff during the Intake and Initial Assessment phase, without considering the Section V.C.1 Administrative Closure path, and without acknowledging the Academic Senate's prior favorable determination on the underlying grade matter. When plaintiff raised these issues (see ¶ 70), Inkelas asserted only that the Procedure "do[es] not require an interview with the Respondent."

78. **Plaintiff's protected activity.** Plaintiff engaged in protected activ-

ity, including but not limited to: filing this action on March 7, 2025; litigating this action, including by opposing defendants' motion to dismiss and participating in this Court's Rule 26(f) process; communicating with defendants regarding resolution of this action; serving Initial Disclosures pursuant to Rule 26(a)(1); and pursuing his constitutional and statutory rights through this Court. Plaintiff's protected activity also encompasses the protected speech and complaints underlying the existing claims in this complaint, including plaintiff's public-concern speech on UC Berkeley's allocation of public resources between administration and teaching.

79. **Causation.** Upon information and belief, the April 24 referral was issued in substantial part because of plaintiff's protected activity. The temporal proximity between plaintiff's substantive settlement communications and the April 24 referral, UC's two-year prior knowledge without referral, the documented conflicts of the Designee, the procedural irregularities in the referral process, the connection of the underlying grade matters to Campus Counsel Robinson's previously-pleaded interventions, and the Academic Senate's prior determination favorable to plaintiff all support a plausible inference that the referral was retaliatory rather than based on a legitimate institutional disciplinary purpose. On information and belief, the individuals who routed, approved, issued, or caused the April 24, 2026 referral — including Inkelas and the Doe Defendants — knew of Plaintiff's federal action, the Court's recent ruling, and Plaintiff's recent settlement communications, or acted in coordination with officials who had that knowledge.

## ALLEGATIONS OF ACTUAL MALICE (CAL. GOV. CODE § 825(b))

80. **Defendant Canny's actual malice.** Defendant Canny acted with actual malice toward plaintiff within the meaning of California Government Code § 825(b). Specifically:

(a) In OPHD testimony, Canny characterized plaintiff as having "racist thinking" and as "so poorly suited" for the Anti-Racism Committee. Canny acknowledged that he "didn't make a decision" transparently and instead was "trying to exit gracefully" and "not tell [plaintiff] why he was so poorly suited." Canny thus acknowledged making a pretextual committee-membership decision while concealing his actual reasoning from plaintiff.

(b) The factual foundation Canny offered to OPHD investigators for the "racist thinking" characterization was a materially false account of an incident concerning a course slide. Canny testified that "Complainant assigned a project where students were asked to create a Pacman-like game called 'Pac Lives Matter"' and that plaintiff "apologized but refused to include the name of the assignment despite a request for him to do so." Yet in that same June 29, 2020 email thread, Canny had contemporaneously approved the steps plaintiff was taking to address the very incident he later recast to OPHD, writing to plaintiff, "All the steps were good." At the time, Canny treated the matter as a routine teaching issue, not as evidence of "racist thinking." Canny's subsequent recasting of the same incident, to OPHD investigators, as evidence that plaintiff harbored "racist thinking" is contradicted by his own contemporaneous approval — a shift in account probative of pretext and state of mind. The actual facts contradict Canny's characterization in material respects, as plaintiff's contemporaneous correspondence — including

that June 29, 2020 email thread on which Canny was copied and in which he participated — establishes:

(i) There was no "Pac Lives Matter" assignment. Students were not asked to create a Pacman-like game called "Pac Lives Matter" or to engage with that phrase as the framing of any project. The phrase appeared only as one example team name on a single instructional slide displaying multiple possible team names;

(ii) The slide containing the phrase was created by previous instructors years earlier and reflected the cultural context of its creation date, which substantially predated the May 2020 murder of George Floyd. The slide was inherited course material, not material created or curated by plaintiff;

(iii) The slide was presented in the course by a co-instructor who was a graduate student, not by plaintiff. The slide appeared as part of an overview presentation on the first day of class. Plaintiff exercised no contemporaneous instructor judgment regarding the presentation of that specific slide content;

(iv) Canny's characterization that plaintiff "assigned a project" framed around the phrase falsely attributes to plaintiff a personal pedagogical decision that plaintiff did not make. The distinction is material: an instructor who chooses to frame a student project around a particular phrase exercises real-time judgment that may reflect instructor values, while an inherited example team name on an overview slide presented on the first day of class by a graduate student instructor involves no comparable instructor judgment. Canny, as Chair of the department during the relevant period, understood the difference between assigning a project and showing an inherited slide;

(v) Approximately one month before the matter reached Canny in his ca-

pacity as Chair, plaintiff and lead course staff drafted and sent a thorough written apology to the activist amplifying the student complaint, for forwarding to the affected student. The drafting of that apology was the product of an hours-long process;

(vi) Subsequently, in a meeting with Canny and Dean Sunny Lee, plaintiff provided the previously-sent apology letter, establishing Canny's direct first-hand knowledge that an apology had already been drafted and sent before he became involved as Chair;

(vii) Following the meeting with Canny and Dean Lee, plaintiff drafted a second apology in consultation with a campus communications expert, working over a period of hours to develop the apology in a manner consistent with effective communications practice, and made a public post on the course website. Canny was aware of this subsequent process;

(viii) In both apology letters, plaintiff took responsibility for the slide's appearance in the course materials, despite the slide having been created by previous instructors and presented by a graduate-student co-instructor. Plaintiff took such responsibility because he was the senior faculty instructor in the course, and considered it appropriate to bear institutional accountability rather than deflecting onto a graduate student. This conduct reflects engaged institutional citizenship, not the dismissive or unaccountable behavior implied by Canny's characterizations to OPHD; and

(ix) Plaintiff's specific and narrow refusal was limited to including the inflammatory phrase itself in the apology letter and website post. Plaintiff's reasoning was that an apology should not amplify or republish the very content that gave offense, and that doing so during a sensitive period following

the Floyd murder could inflame rather than resolve the matter.

Canny's testimony to OPHD investigators thus contained material factual inaccuracies (attributing an assignment to plaintiff that did not exist, attributing a pedagogical decision to plaintiff that plaintiff did not make) and material omissions (the inherited nature of the slide, the co-instructor's role in presenting it, the timing relative to the Floyd murder, the first apology letter plaintiff had personally provided to Canny, the second apology developed with a communications expert, the website post, and the principled basis for plaintiff's narrow refusal). Canny made these statements with knowledge of facts contradicting his characterization, having had direct personal involvement in the matter, having reviewed plaintiff's first apology letter, and having been aware of the institutional response process. Canny's statements were made with knowledge of their falsity or with reckless disregard for the truth.

(c) In the same OPHD testimony, Canny acknowledged categorizing EECS faculty by ethnicity for committee-composition purposes, expressly grouping "Chinese, Japanese, Indian and Caucasian" faculty as a single "majority" category whose representation Canny sought to limit on the Anti-Racism Committee. Canny explicitly tied his denial of plaintiff's committee membership to plaintiff's perceived ethnic categorization, stating that "we shouldn't keep adding more majoritized people." According to the OPHD report, Canny "explained that the majority of faculty in EECS are Indian or of Indian descent."

(d) Canny took adverse personnel action affecting plaintiff's committee participation based on perceived racialized categorization of plaintiff. In a

contemporaneous email exchange with plaintiff, after plaintiff objected that Canny's committee-exclusion rationale was discriminatory, Canny confirmed it, writing: "I gave you a reason. Yes, it was discriminatory. So is racism, but also so is anti-racism." In the subsequent OPHD investigation, Canny sought to recast that contemporaneous statement — characterizing the decision as only "superficially discriminatory," invoking Ibram X. Kendi, and stating that he had been "just in a hurry and wanted to get out of a tussle" with plaintiff. That shifting account is itself probative of pretext and discriminatory state of mind: either Canny's contemporaneous email meant what it said — that he knowingly employed race-based criteria — or his later OPHD explanation was a post-hoc attempt to minimize a discriminatory rationale after plaintiff challenged it. Either way, Canny knowingly engaged in racial classification of plaintiff for institutional decision-making purposes.

(e) In OPHD testimony, Canny acknowledged that plaintiff's posts "may be protected by free speech." Canny stated, however, that his "goal was to 'pull [plaintiff] offline,"' so that Canny "wasn't launching at the entire faculty." The structure of Canny's own statement – acknowledged constitutional protection followed by stated goal of suppression – establishes that Canny admitted awareness of constitutional protection for plaintiff's speech and proceeded to suppress it. Canny's stated reason for individualized targeting of plaintiff (avoiding broader institutional consequences) is itself evidence of selective suppression of an acknowledged-protected speaker, the precise pattern that First Amendment retaliation doctrine prohibits.

(f) Canny acknowledged marking up plaintiff's emails on departmental policy issues including plaintiff's advocacy regarding GRE admissions require-

ments, in which Canny held an opposing institutional position, and sending the marked-up versions back to plaintiff. Canny's marking up and return of plaintiff's protected speech on departmental policy was conduct intended to discredit plaintiff's policy advocacy and to chill plaintiff's protected expression.

(g) The institutional record reflects that OPHD's investigation concluded plaintiff's protected speech and policy advocacy were part of the basis for Canny's actions against plaintiff, including Canny's recommendation to decelerate plaintiff and Canny's denial of committee participation.

(h) Canny's adverse characterizations of plaintiff included invocations of plaintiff's purported failure to be "humble." Canny characterized plaintiff's principled refusal to include the inflammatory phrase in the apology as failure "to be humble when you don't understand something." Canny characterized plaintiff's substantive disagreement with Canny's committee-membership decision as failure to be humble. That Canny — a white faculty member — repeatedly recast the reasoned, good-faith positions of a faculty member of Indian descent, on issues of race and committee participation, as failures of "humility," while positioning himself as the authority on those issues and treating disagreement as a character defect rather than a legitimate view, is evidence of discriminatory, race-based treatment and of bullying.

These facts, taken together, establish that Canny acted with actual malice toward plaintiff, including: knowing falsity or reckless disregard for the truth in the factual characterizations offered to OPHD investigators as foundation for adverse characterizations of plaintiff; engagement in pretextual decision-making with concealment of actual reasoning; knowing engagement in racial

classification of plaintiff for institutional purposes; and knowing suppression of plaintiff's protected speech on institutional policy matters.

81. **Defendant Plaut's actual malice, or at minimum reckless or callous indifference, and institutional ratification.** On information and belief, Defendant Plaut acted willfully and with actual malice toward Plaintiff within the meaning of California Government Code § 825(b), or at minimum with reckless or callous indifference to Plaintiff's federally protected rights, by ratifying Defendant Canny's misconduct after specific dated notice of its factual falsity and constitutional significance. Specifically:

(a) As Vice Provost for the Faculty and supervisor of OPHD, Plaut was the final institutional decision-maker on the OPHD investigations involving plaintiff. Plaut's decisions were the institutional ratification (or rejection) of the underlying testimony and findings, including those of Defendant Canny;

(b) On information and belief, Plaut's role was not limited to a late-stage OPHD decision. As Chair of the Budget and Interdepartmental Relations Committee and as Vice Provost for the Faculty, Plaut participated in or bore institutional responsibility for both the personnel-review process that adopted adverse characterizations of plaintiff and the OPHD processes that ratified or failed to correct the factual bases for those characterizations. Her March 30, 2023 decision therefore did not occur in isolation; it ratified the same adverse narrative that had already affected plaintiff's personnel review;

(c) On December 7, 2022, plaintiff provided Plaut with a formal written response to the OPHD investigation report concerning Defendant Canny, including detailed identification of specific factual problems with Canny's testimony and the OPHD investigation. A true and correct copy of plaintiff's

December 7, 2022 letter is attached as Exhibit 22 and incorporated herein by reference.

(d) In the December 7, 2022 written submissions to Plaut, plaintiff specifically identified, among other things: (i) Canny's own admission that he made knowingly false statements to plaintiff ("Canny admits to lying to Rao... Canny admits to lying to Rao on another occasion"); (ii) the falsity of Canny's claim that plaintiff had "assigned a racist project" ("Canny... falsely made the outrageous claim that Rao had assigned a racist project. Rao did no such thing"); (iii) the slide-versus-assignment distinction and that plaintiff "neither made nor presented" the slide in question; (iv) Canny's acknowledgment of plaintiff's free-speech rights followed by his stated goal of suppression; (v) Canny's direct admission of discrimination in email to plaintiff; (vi) Canny's caste-probing, including the corroborating witness testimony from former Chair Bokor characterizing such conduct as "egregious and highly unprofessional and irregular"; (vii) the pattern of continuing retaliation following plaintiff's 2018 complaint about which prior institutional leadership had specifically warned chairs not to retaliate; and (viii) the institutional response by Chair Wagner, who acknowledged Canny's discriminatory behavior but nonetheless forwarded the resulting departmental recommendation;

(e) On March 30, 2023, Plaut issued her Notice of Decision in OPHD Case No. 2021-UCB-00381. A true and correct copy of Plaut's March 30, 2023 decision letter is attached as Exhibit 23 and incorporated herein by reference. The decision letter stated in its entirety, as to substantive disposition: "Thank you for the documents you sent, which I have carefully reviewed,

along with the investigation reports. I am writing to notify you of the final decision in this matter. The Office for the Prevention of Harassment and Discrimination ('OPHD') issued the November 3, 2022 Notice of Outcome notifying you, the Complainant, that the conduct alleged in the April 29, 2022 Notice of Allegations, based on the investigator's factual findings, was not substantiated and the Respondent was found not responsible for violations of the applicable UC Nondiscrimination Policies. Following OPHD's referral, I reviewed the November 3, 2022 Report of Investigation to determine whether there are other violations of applicable policies (which the investigator made no finding about) and determined there were not. Based on the information as laid out above, it is my decision that no further action is warranted, and this matter is now closed."

(f) Plaut's March 30, 2023 decision letter expressly represented that she had "carefully reviewed" plaintiff's December 7, 2022 submissions. The decision letter did not, however, address or engage with any of the specific factual contradictions plaintiff had identified, including the falsity of the "Pac Lives Matter" assignment characterization, Canny's admitted knowingly false statements, Canny's acknowledgment of plaintiff's free-speech rights followed by stated suppression goal, the caste-probing, or the continuing retaliation pattern. The decision contained no reasoning beyond the bare statement that "no further action is warranted";

(g) The combination of Plaut's express representation of careful review and her conclusion without any substantive engagement with the specific factual contradictions establishes that Plaut either (i) did review the December 7, 2022 submissions carefully and chose to ignore their content, which con-

stitutes reckless disregard for truth, or (ii) did not in fact carefully review the submissions despite stating she did, which constitutes a written misrepresentation about her institutional process. Both alternatives support the conclusion of malice through reckless disregard;

(h) Plaut's March 30, 2023 decision also limited the scope of her review to "whether there are other violations of applicable policies" that the investigator had not addressed — not whether the investigator's factual findings were reliable given the contradictions plaintiff had identified. This narrowing of inquiry to formal-policy questions, while declining to engage with the factual-foundation problems plaintiff specifically raised, constitutes deliberate institutional process designed to avoid engaging with the factual issues. Moreover, even on the narrow ground Plaut herself chose, her premise that there were no "other violations of applicable policies" was untenable: Canny's own documented conduct — including the caste-probing that former Chair Bokor characterized as "egregious and highly unprofessional and irregular" and Canny's admitted race-based decision-making — squarely implicated the Faculty Code of Conduct (APM-015), even where it fell outside OPHD's narrower jurisdiction. That Plaut construed "applicable policies" so narrowly as to clear Canny, while the University construes the same Faculty Code of Conduct expansively enough to refer plaintiff himself to the Committee on Charges, reflects the selective enforcement pervading plaintiff's treatment;

(i) Plaut had institutional means available to verify the factual contradictions plaintiff identified, including access to course records (which would have shown the absence of any "Pac Lives Matter" assignment), the slide deck itself, institutional records of the apology process, and the email and OPHD

testimony plaintiff had specifically quoted to her. Plaut did not undertake or rely upon such verification before reaching her conclusion that no further action was warranted;

(j) As Vice Provost for the Faculty, Plaut bore institutional responsibility for ensuring that adverse personnel actions against faculty were based on accurate factual foundations. Her decision letter, reached after specific written notice of factual problems, expressly representing careful review but providing no engagement with the problems identified, constitutes institutional ratification of Canny's misconduct rather than independent institutional review.

(k) Plaintiff's December 7, 2022 written submissions to Plaut also identified a then-pending OPHD investigation initiated November 14, 2022 concerning gender-based allegations against plaintiff. In those submissions, plaintiff identified the specific factual defenses to those allegations: that most incompletes plaintiff gave in the relevant semester were to female students, that the complainant had not requested an incomplete, and that the complainant had completed the full course including the final examination such that an incomplete was not appropriate. Plaintiff identified these defenses to Plaut months before OPHD's institutional process eventually accepted those same defenses and cleared plaintiff of the gender-based allegations. Plaut thus had institutional notice in December 2022 that the gender-based investigation was based on allegations the institution would itself eventually conclude were unfounded. Plaut's subsequent March 30, 2023 decision ratifying the Canny-related findings was made with this institutional knowledge of the broader pattern in which adverse OPHD investigations were being pursued

against plaintiff on grounds that institutional process would not sustain.

These facts plausibly establish actual malice on information and belief, or at minimum reckless or callous indifference to plaintiff's federally protected rights: Plaut ratified adverse characterizations of plaintiff after specific dated written notice of their factual problems, represented that she had carefully reviewed those problems, provided no substantive engagement with them, and did not undertake available means of verification. Plaintiff alleges actual malice because the pleaded facts support the inference that Plaut knowingly ratified a false and retaliatory institutional narrative; Plaintiff alleges reckless or callous indifference in the alternative.

82. **Defendant Liu's actual malice, or at minimum reckless or callous indifference, and pretextual strawman reframing.** On information and belief, Defendant Liu acted willfully and with actual malice, or at minimum with reckless or callous indifference to Plaintiff's federally protected rights, by repeatedly treating plaintiff's complaint as though it turned on whether staff had literally used the word "racist," while disregarding the substance of the complaint: that staff had accused plaintiff of being biased against underrepresented-minority students and of intending to misuse data because he is Asian. Plaintiff's December 27, 2018 complaint did not allege that any staff member had literally used the word "racist"; it described a veiled accusation of racial bias. Defendant Liu nonetheless answered that literal non-claim — responding, in substance, that no one had accused plaintiff of racism and that the named staff had not "called [plaintiff] a racist" — and continued to advance that literal-word framing through the recorded October 11, 2024 meeting, where she told plaintiff, "nobody has accused you of be-

ing racist" and characterized plaintiff's position as, "you're accusing them of accusing you of being racist" (Certified Transcript 38:2–3, 46:16–19). Defendant Liu was a senior dean responsible for applying anti-discrimination and faculty-personnel standards; had notice of plaintiff's protected complaint; framed the matter, upon information and belief, as one of staff intimidation; participated in the process that generated plaintiff's written questions to staff; later relied on the staff reaction to those questions as part of the deceleration rationale; and recommended deceleration in both the initial evaluation and on reconsideration. Defendant Liu's reframing was not an isolated misreading but part of a course of conduct inverting plaintiff's complaint into a grievance against him: in her January 27, 2020 letter closing the investigation of that complaint, Liu directed a faculty-wide lecture on "the important role of staff"; she never warned the named staff against retaliating for plaintiff's protected complaint, though prior institutional leadership had expressly warned chairs not to; and she relied on the resulting staff reaction as part of the deceleration rationale. Casting the faculty member who complained of discrimination as the offender against staff, together with her substitution of a literal-word defense for the coded racial accusation actually at issue — by an actor trained and positioned to understand the difference — plausibly supports actual malice on information and belief, or at minimum reckless or callous indifference to Plaintiff's rights. That Defendant Liu — a senior dean trained to recognize both the coded accusation and the retaliation bar — persisted in the inverted framing across years and reaffirmed the deceleration on reconsideration, even after plaintiff's detailed written rebuttal, reflects conscious disregard of plaintiff's rights rather than misunderstanding.

At the recorded October 11, 2024 meeting, Liu went further, acknowledging

that the staff reaction underlying the deceleration arose "because you gave them some questions that were quite accusatory and asked for an affidavit" — tying the deceleration to those same questions, generated through the complaint process in which she had participated — yet left the deceleration undisturbed. (Oct. 11, 2024 Certified Tr. 19:1–3.)

## FURTHER FACTUAL ALLEGATIONS

83. **Records preservation request and institutional notice of litigation.** On or about March 30, 2023, immediately following receipt of Plaut's Notice of Decision, plaintiff sent a written response to Plaut that, among other things: (a) requested that Plaut and OPHD preserve all records in the matter, including all records and notes of conversations between the investigator and others; (b) characterized the institutional conduct as "admitted discriminatory behavior" and stated that the matter "is likely a matter for the courts at this point"; and (c) copied campus counsel on the communication. By means of this March 30, 2023 communication, plaintiff provided UC with formal notice of anticipated litigation, triggering UC's preservation obligations as of that date. Campus counsel was placed on notice of the dispute and the institutional conduct at issue. UC has been on continuous notice of preservation obligations from at least March 30, 2023 through the present.

84. **Public posting of teaching evaluations: the practice, the protections, and disregard of faculty governance.** During the period preceding 2023, plaintiff's department (EECS) engaged in a distinctive institutional practice of publicly posting faculty teaching evaluations on the web,

either directly or through coordination with a student organization. This practice was unique to plaintiff's department; no other UC department engaged in this practice. Teaching evaluations are collected in part for the purpose of evaluation in academic personnel decisions including merit, promotion, and continued appointment. UC institutional policy and California law establish substantial protections for the confidentiality of employee personnel records and recognize employees' privacy interests in those records. UC's own Academic Personnel Manual, Berkeley campus data classification standards, and California statutory and constitutional frameworks each reflect these protections. Defendants and other institutional actors, in their roles as Chair, Dean, Vice Provost for the Faculty, and campus counsel, occupied positions in which these confidentiality protections were established and known. The public-posting practice operated outside these institutional and legal frameworks, notwithstanding institutional knowledge of them. Plaintiff raised concerns about this practice to defendants and other institutional actors, including Defendant Canny and former Chair Wagner. When plaintiff raised concerns to Wagner, Wagner responded that he had not heard other complaints about the practice and suggested plaintiff talk to other faculty about the issue. Plaintiff chose to address the matter through a transparent process – a faculty poll – rather than through private conversations. The faculty poll documented that opposition to the practice was not isolated to plaintiff; faculty voted against the practice. Wagner and the institution nonetheless continued the practice notwithstanding the documented faculty vote against it. This sequence – institutional dismissal of plaintiff's concern as isolated, followed by transparent demonstration that the concern was widely shared, followed by continuation of the practice notwithstanding –

reflects the broader pattern of pretextual institutional process alleged elsewhere in this complaint, in which institutional procedures or suggestions are invoked for legitimacy while substantive outcomes adverse to plaintiff are predetermined.

85. **Effect of the practice on plaintiff and prior Canny-Rao debate on the practice.** The public-posting practice affected the evaluation materials used in plaintiff's personnel reviews, including the 2021 deceleration, through anchoring effects on subsequent evaluations and other mechanisms. Plaintiff is informed and believes that the institutional conduct of continuing the practice despite documented faculty opposition was known to or directed by Defendant Canny during his tenure as Chair, supporting the broader pattern of Canny's institutional misconduct against plaintiff. On information and belief, other institutional actors, including Chair Tomlin and Professor Malik, were also on notice of the practice. Plaintiff and Defendant Canny had previously engaged in extended written debate on the EECS faculty email list regarding this practice, in which plaintiff opposed the practice and Canny defended it. That prior documented policy disagreement, on which plaintiff's position eventually prevailed in faculty governance through the poll described above, provides context for Canny's subsequent adverse conduct toward plaintiff and supports the inference that Canny's institutional actions against plaintiff were motivated in part by prior substantive disagreements on departmental policy matters in which Canny held positions plaintiff had effectively challenged.

**TIMELINESS**

86. The claims under 42 U.S.C. §1983 are timely. The challenged deceleration was not complete and final until August 12, 2024, when the University issued, and on August 13, 2024 communicated to Plaintiff, the final decision on reconsideration; the preliminary decision had been communicated in August 2022, and Plaintiff diligently pursued reconsideration from August 11, 2023 through the August 12, 2024 final denial. Until that final decision the University's decisional process was under active reconsideration and nonfinal, and Defendants withheld the specific factual bases for the deceleration until the recorded October 11, 2024 meeting. The face of this complaint therefore alleges facts rendering the §1983 claims timely under the applicable two-year limitations period; in the alternative, the limitations period was equitably tolled during Plaintiff's good-faith pursuit of internal reconsideration and grievances.

87. The Title VII and FEHA claims are timely. The reconsideration was a continuing decisional process, not a single completed act: it included the October 26, 2023 reaffirmation by the Deans — an adverse determination within the three hundred days preceding Plaintiff's April 5, 2024 charge to the California Civil Rights Department — and continued to the final denial on August 12, 2024. Plaintiff received an EEOC right-to-sue notice on December 4, 2024, timely filed this action on March 7, 2025, and filed a parallel state action on October 13, 2025 to satisfy the California right-to-sue requirement.

**Claims for Relief.**

88. **Scope of the claims.** Unless a Count expressly states otherwise, Counts One through Ten, other than Count Four, are asserted only against the defendants named in the Second Amended Complaint — Defendants Canny, Liu, Chayes, Plaut, Broughton, and the Regents of the University of California, as applicable. Count Four is asserted only against Doe Defendants 11–100, and no Count other than Count Four asserts any claim against those Doe Defendants. Count Eleven is asserted only against Defendant Inkelas and Doe Defendants 1–10 (the April 24, 2026 referral participants), in their individual capacities, and no Count other than Count Eleven asserts any claim against Defendant Inkelas or Doe Defendants 1–10.

**Count 1 – First Amendment Retaliation (42 U.S.C. §1983)**

89. Plaintiff incorporates the preceding paragraphs.

90. Plaintiff engaged in protected speech on matters of public concern (academic policy, governance and academic administration, and discrimination complaints).

91. Defendants were aware of the speech and adversely acted against Plaintiff (deceleration; service restrictions; retaliatory investigations).

92. The adverse actions were causally linked to Plaintiff's speech and would chill a person of ordinary firmness.

93. Defendants lacked adequate, lawful justification independent of Plaintiff's protected speech.

94. Defendants' Actions.

1. **John Canny** — On July 13, 2021, recommended deceleration despite acknowledging Plaintiff met the normal-step standard. The recommendation followed Canny's prior email harassment of Rao for his protected speech.[5] Canny later admitted to OPHD that Plaintiff's speech was protected,[6] and OPHD found that the speech was a motivation for the deceleration.[7] Plaintiff's emails highlighted by Canny included a broad set of topics, including GRE, teaching-assistant funding, and other matters of public concern.

2. **Tsu-Jae King Liu** — With knowledge of Plaintiff's criticisms of higher administration and protected complaints (2019–2024), adopted Canny's deceleration and concurred that vague accusations of Plaintiff's criticism of higher administrations were cause to decelerate Plaintiff. (See Exhibit 3e at 3, line 2.)

3. **Jennifer Chayes** — With knowledge of Plaintiff's criticisms of higher administration and protected complaints (2019–2024), adopted Canny's deceleration and concurred that vague accusations of Plaintiff's criticism of academic administration were cause to decelerate Plaintiff. (See Exhibit 3e at 3, line 2.)

4. **Victoria Plaut** — In her capacity as Chair of the BIR, added and endorsed the accusation that Plaintiff's criticisms of higher administration were themselves problematic. Separately, as Vice Provost with final say over the OPHD investigations following Plaintiff's protected complaints (2022), she did not treat Canny's attack on Plaintiff's protected speech as a problem,

[5] At 14, ¶ 40
[6] Exhibit 1, ¶ 64
[7] At 6, ¶ 15.

though APM 010 makes clear such speech is protected. She had ample time and authority to correct it and did not. (See Exhibit 3c at 3, ¶2.)

5. **Janet Broughton** — On July 28, 2022, in substance indicated Plaintiff's criticisms of administration were objectionable, contributing to adverse decisions. (See Exhibit 3d at 3, ¶3.)

6. BIR (Chaired by Victoria Plaut and others to be fully identified) — In communications to Plaintiff and/or departmental leadership, stated in substance that Plaintiff's criticism of higher administration was problematic, which Plaintiff alleges reflected retaliatory animus and influenced the adverse actions. (See Exhibit 3c at 3, ¶2.)

95. Defendant Canny recommended the deceleration with retaliatory animus against Plaintiff's protected speech and complaints, intending that Plaintiff be denied a normal merit advancement. The remaining Defendants — Chayes, Liu, Broughton, and Plaut — adopted and ratified Canny's recommendation without conducting any independent investigation of the specific factual bases, thereby making Canny's retaliatory animus a proximate cause of the deceleration. See Staub v. Proctor Hospital, 562 U.S. 411 (2011).

96. The original individual defendants and the Regents know faculty have constitutional rights to speech and academic freedom, it is both embedded in policy (APM 010) and law (see, for example, Demers v. Austin, 746 F.3d 402, 417 (9th Cir. 2014)). All Deans and Provosts used ample periods of time, have lots of staff and resources to adjudicate this process fairly.

97. Plaintiff is entitled to damages against the original individual defendants and prospective declaratory/injunctive relief against the Regents and/or

appropriate officials in their official capacities where appropriate.

**Count 2 – Procedural Due Process (42 U.S.C. §1983)**

98. Plaintiff incorporates the preceding paragraphs.

99. *Property Interest:* UC's APM and campus policies create a legitimate claim of entitlement to criteria-based step advancement and related procedural safeguards. *See Mendoza v. Regents* (1978) 78 Cal.App.3d 168, 173–175 (the University's own rules and understandings create constitutionally protected property interests, applying *Board of Regents v. Roth* (1972) 408 U.S. 564 and *Perry v. Sindermann* (1972) 408 U.S. 593). See Exhibit 17 for the Academic Personnel Manual on Promotions.

100. *Property Interest.* The loss of good standing due to deceleration caused Rao to lose $ 14,000 in yearly salary (and associated retirement benefits) regardless of whether he received a merit advancement. (See ¶ 5-6.) Thus, the deceleration was not merely a denial of a merit advancement; as pleaded here, it functioned as discipline because it imposed salary and status consequences based on alleged misconduct — specifically, punishment for alleged "bullying" under the "Guidelines for bullying," notwithstanding the lack of authority to impose such discipline. It therefore becomes a disciplinary deprivation of a property interest that, under the Fourteenth Amendment, required at a minimum pre-deprivation notice of the specific charges and a meaningful opportunity to respond. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542–46 (1985); Mathews v. Eldridge, 424 U.S. 319 (1976). Any such process would have required the Chair, Deans, and Vice Provost to provide details of the supposed harassment of staff. For example,

the one provided by Dean Liu on October 11, 2024, that it was in response to written questions.

101. All reviewers acknowledged that Plaintiff's records of research, teaching, and mentoring supported a normal merit advancement under APM-210. Across every decision letter, the determinative basis for decelerating that advancement was Plaintiff's alleged interactions with staff — yet at no point were those interactions, or any of the other bases invoked in the review chain, ever specified with particularity.

102. Defendants Canny (see exhibit 3a), Chayes and Liu (see exhibits 3b,3e,Exhibit 4a), and Broughton (see exhibits 3d,4c) imposed deceleration and continuing restrictions without timely and specific notice of charges, disclosure of evidence, or a meaningful opportunity to respond prior to the decision or reconsideration. Defendant Plaut (as chair of BIR and other unnamed persons on BIR) did so as well (see Exhibit 3c and 4b).

103. The original individual defendants' conduct violated Plaintiff's Fourteenth Amendment right to procedural due process. Those Defendants are well aware of their obligations to follow the APM and are highly staffed to do so. The Regents are liable for relief as appropriate.

104. Plaintiff seeks damages against the original individual defendants and prospective declaratory/injunctive relief in their official capacities where appropriate.

**Count 3 – Equal Protection (42 U.S.C. §1983)**

105. Plaintiff is a member of protected classes based on his race, ancestry, and caste (South Asian / Indian descent).

106. (Against individual defendants; prospective relief in official capacities)

107. Defendant Canny intentionally treated Plaintiff differently from similarly situated faculty outside Plaintiff's race, ancestry, and caste (South Asian / Indian descent), and did so through express protected-category classifications and departures from ordinary standards. (See Exhibit 11 at 6, ¶5.)

108. Defendant Canny's discriminatory intent is established by his own contemporaneous words. When Plaintiff volunteered for the Equity & Inclusion committee, Canny declined him on September 12, 2020, writing: "the composition of the committee is an important part of the message we send by forming it. We dont want a majority of 'majority' faculty on it." Canny then expressly invoked caste: "we really do need representation from some folks with more direct experience of discrimination. Actually an Indian faculty member from a scheduled caste would be very good for this committee. I'm sorry if I got things wrong, but I had assumed that you (and our other Indian faculty) were not from that group." When Plaintiff objected that this was a discriminatory practice and asked for a non-discriminatory reason, Canny admitted on September 14, 2020: "I gave you a reason. Yes, it was discriminatory. So is racism, but also so is anti-racism. I dont have any other reasons to give." (Exhibit 11.)

109. Canny acted with the discriminatory animus established by the fore-

going statements and, intending that Plaintiff be denied a normal merit advancement, recommended the deceleration. The remaining Defendants — Chayes, Liu, Broughton, and Plaut — were aware of Canny's conduct toward Plaintiff and yet adopted and ratified his recommendation without conducting any independent investigation of the specific factual bases, thereby making Canny's discriminatory animus a proximate cause of the deceleration. See Staub v. Proctor Hospital, 562 U.S. 411 (2011).

110. Defendants' discriminatory conduct violated the Equal Protection Clause.

111. Plaintiff seeks damages against the original individual defendants and prospective declaratory/injunctive relief in their official capacities where appropriate.

**Count 4 – Conspiracy to Deprive Civil Rights (42 U.S.C. §1983)**

(Against Doe Defendants 11–100, in their individual capacities.)

112. For purposes of this Count Four, "Defendants" refers only to the defendants against whom this Count is asserted, and does not include Defendant Inkelas or Doe Defendants 1–10.

113. Upon information and belief, Defendants agreed and acted in concert to deprive Plaintiff of federal rights, including First Amendment (speech) and Fourteenth Amendment (Procedural Due Process and Equal Protection), and committed overt acts under color of state law that caused injury.

114. **Agreement and coordination.** On information and belief, beginning no later than 2021 and continuing through 2024–2025, Doe Defendants 11–100 personally agreed or acted in concert regarding Plaintiff's protected

speech, staff complaints, and advancement/discipline outcomes, with the purpose and effect of silencing criticism of higher administration, retaliating for protected complaints, and sustaining adverse measures without fair process. (See Exhibit 1.)

115. In furtherance of the agreement, Defendants undertook overt acts, including but not limited to:

1. Maintaining/ratifying the 2021 deceleration and later denying relief in reconsideration (Aug. 12, 2024) while withholding specifics of alleged misconduct until Oct. 11, 2024. (¶ 9 and Exhibit 2).

2. Channeling and invoking BIR complaint and climate rationales in personnel recommendations while refusing to disclose particulars sufficient for rebuttal.

3. Committee/service decisions (e.g., non-reappointment to the Undergraduate Study Committee) based on staff complaints not disclosed to Plaintiff at the time.

4. Use, adoption, or ratification of statements by senior administrators — including the BIR Chair/Plaut upon information and belief, Chayes, Liu, and Broughton — that Plaintiff's "criticism of higher administration" was problematic, to sustain adverse measures.

116. **Known relevant actors whose conduct bears on the Doe-conspiracy allegations.** These allegations identify known relevant actors and areas for discovery; Plaintiff does not presently assert Count Four against these named individuals unless and until discovery supports their personal participation in an unlawful agreement.

1. Robinson — On information and belief, participated in or advised on the routing, approval, or ratification of the retaliatory deceleration theory, including the position that reliance on Plaintiff's protected complaint activity was permissible.

2. David Wagner — As Chair, adopted/maintained actions initiated by predecessors, coordinated with OFEW (Frasch), and relied on staff-climate rationales without providing particulars. (See Exhibit 1, ¶ 27.)

3. Frasch — Participated in coordinated handling of complaints regarding discriminatory conduct by Canny.

4. OPHD personnel, including Victoria Plaut — Initiated/oversaw OPHD processes to arrive at outcome; as BIR chair, upon information and belief, Plaut added/endorsed the accusation that Plaintiff's criticism of higher administration was "problematic."

117. Rights and injury. The concerted conduct targeted Plaintiff's protected speech, denied timely, specific notice and evidence before adverse decisions, and treated him differently than similarly situated faculty; it caused career harms, chilled speech, and imposed administrative burdens.

118. Relief. Damages against Doe Defendants 11–100 in their individual capacities.

119. Plaintiff knows the identities of some University personnel involved in the relevant events, including Plaut, Robinson, Wagner, Frasch, Rome, and OPHD personnel. Plaintiff does not yet know, without discovery, which of those persons, or others, personally agreed to use the deceleration, OPHD, or related University processes to punish protected activity, as opposed to

participating only in ordinary administration, investigation, legal advice, supervision, or ratification. Count Four is therefore asserted against Doe Defendants 11–100 to preserve claims against persons whose personal participation in an unlawful agreement is presently unknown; Plaintiff does not presently assert this Count against those named individuals unless and until discovery supports their personal participation, and reserves the right to seek leave to amend this Count as discovery develops.

**Count 5 – Title VII: Discrimination and Retaliation — Against the Regents**

120. Plaintiff incorporates the preceding paragraphs.

121. Plaintiff engaged in protected activity, including his formal complaint to Dean Liu (December 2018–July 2019) reporting the staff's false accusations and raising his good-faith belief that they were based in part on his ancestry — a belief grounded in the accusing staff member's having objected to another faculty member of South Asian descent while raising no such concern as to five faculty members of European descent — and his opposition to what he reasonably and in good faith believed to be discrimination and retaliation. He was thereafter subjected to adverse actions affecting the terms and conditions of his employment.

122. The actions were motivated by discrimination and/or retaliation.

123. Plaintiff received a right-to-sue letter from the EEOC dated December 4, 2024 and filed this case on March 7, 2025; to the extent required, administrative remedies have been exhausted. Plaintiff seeks prospective

declaratory/injunctive relief and all available Title VII remedies against the Regents.

**Count 6 – FEHA Retaliation (Cal. Gov't Code §12940(h)) — Against the Regents**

124. Plaintiff incorporates the preceding paragraphs. As set forth above, Plaintiff engaged in protected activity, including his formal complaint to Dean Liu reporting the staff's false accusations and raising his good-faith belief that they were based in part on his ancestry, and his opposition to what he reasonably and in good faith believed to be discrimination and retaliation.

125. The retaliation followed directly from that protected activity: in the University's resolution process, Plaintiff and the Academic Senate Ombudsperson formulated written questions to put to staff regarding their accusations; the staff's adverse reaction to those questions was then recharacterized as Plaintiff's own "harassment" of staff and made the stated basis for the deceleration. On October 11, 2024, Dean Liu identified those questions — formulated in the course of Plaintiff's discrimination complaint — as the reason for the deceleration. (See ¶ 9.)

126. The Regents, through its supervisors and agents, knew of this protected activity and thereafter subjected Plaintiff to adverse employment actions and other actions reasonably likely to deter a reasonable person from engaging in protected activity, including deceleration, committee/service exclusions, and pretextual statements that Plaintiff's criticism of higher administration was "problematic" — a characterization that is itself improper, as criticism of administration on matters of public concern is protected faculty activity.

The retaliatory conduct also included the OPHD investigations directed at Plaintiff.

127. The adverse actions were **substantially motivated** by Plaintiff's protected activity.

128. Plaintiff timely filed a charge with the California Civil Rights Department (CRD) and received a California Right-to-Sue on October 11, 2024; to the extent required, all administrative prerequisites are satisfied.

129. Relief against the Regents: statutory remedies under §12965(b) (including attorneys' fees/costs), damages, and injunctive relief.

**Count 7 – FEHA Harassment (Cal. Gov't Code §12940(j))**

130. Against Canny, Liu, Chayes, Plaut, Broughton; and Regents under respondeat superior for harassment by agents/supervisors

131. Plaintiff incorporates the preceding paragraphs. Defendants, acting as supervisors/agents of the Regents, subjected Plaintiff to harassment because of his protected characteristics and protected activity, including but not limited to persistent policing of faculty speech; compiling and circulating extensive "marked-up" emails; invoking "hostile work environment" rhetoric; and adding/endorsing accusations that Plaintiff's criticism of higher administration was improper. (See Timeline & Exhibits.)

132. The conduct was severe and/or pervasive and detrimentally affected Plaintiff's working environment.

133. The Regents are liable for supervisor harassment and for failing to take

immediate and appropriate corrective action once on notice: Relief: Damages (including emotional-distress damages) and attorney's fees/costs under §12965(b); punitive damages against individual defendants for oppression, fraud, or malice (Civ. Code §3294); and injunctive relief.

**Count 8 – FEHA Aiding and Abetting (Cal. Gov't Code §12940(i))**

134. Against Canny, Liu, Chayes, Plaut, Broughton.

135. Plaintiff incorporates the preceding paragraphs. Defendants knowingly aided, abetted, incited, compelled, or coerced the doing of acts forbidden by FEHA, or attempted to do so, including by initiating, ratifying, or leveraging OPHD/BIR processes and staff-complaint rationales to sustain adverse actions without timely disclosure of specifics, and by endorsing the view that Plaintiff's criticism of higher administration warranted adverse treatment.

136. Damages and punitive damages (Civ. Code §3294), and injunctive relief.

**Count 9 – FEHA Failure to Prevent Discrimination/Harassment/Retaliation (Cal. Gov't Code §12940(k))**

137. Plaintiff incorporates the preceding paragraphs. The Regents failed to take all reasonable steps to prevent discrimination, harassment, and retaliation, including by not providing timely, specific notice of accusations; not ensuring investigation and disclosure sufficient for rebuttal; and by maintaining adverse measures after protected activity.

138. Relief: Damages and injunctive relief, including policies, training, and corrective action consistent with §12940(k). Against Regents.

**Count 10 – FEHA Discrimination (Cal. Gov't Code §12940(a))**

139. Plaintiff incorporates the preceding paragraphs. Plaintiff is a member of protected classes (including race/ancestry/ethnicity). He was subjected to adverse employment actions (including deceleration and related restrictions) and treated less favorably than similarly situated faculty outside his protected classes.

140. The adverse actions were substantially motivated by discriminatory considerations, as evidenced by statements, departures from standard procedures, and disparate treatment.

141. Plaintiff timely filed a charge with the CRD and received a Right-to-Sue on October 11, 2024; to the extent required, all administrative prerequisites are satisfied.

142. Relief: All remedies available under FEHA, including back pay/front pay, emotional-distress damages, injunctive/declaratory relief, and fees/costs under § 12965(b). Against Regents.

**Count 11 – First Amendment Retaliation (42 U.S.C. §1983) — April 24, 2026 Referral**

143. Plaintiff incorporates by reference all preceding paragraphs of this complaint.

144. Plaintiff engaged in protected activity under the First Amendment, including the conduct described in ¶ 78.

145. Defendant Inkelas, acting under color of state law as the Chancellor's Designee, together with Doe Defendants who participated in causing the referral, took adverse action against plaintiff by issuing the April 24 Notice of Allegations and Referral to Committee on Charges, which subjects plaintiff to an ongoing disciplinary investigation and proceedings with potential consequences for his employment. Subjecting a faculty member to a disciplinary investigation and referral is itself an adverse action reasonably likely to deter a person of ordinary firmness from engaging in protected speech. See Jensen v. Brown, 131 F.4th 677, 689 (9th Cir. 2025) (treating an investigation and a termination hearing as among adverse actions "reasonably likely to deter" protected speech); Reges v. Cauce, 162 F.4th 979 (9th Cir. 2025) (amended May 14, 2026) (a university's "opening a lengthy disciplinary investigation . . . reprimanding . . . and threatening . . . further discipline . . . plainly qualifies as adverse employment action").

146. Plaintiff's protected activity was a substantial or motivating factor in Defendant Inkelas's and the Doe Defendants' decision to issue or cause the issuance of the April 24 referral. Their conduct would chill a person of ordinary firmness from engaging in protected activity.

147. The referral's retaliatory character is confirmed by the administration's reliance on a complaint it knew to be compromised. Plaintiff sent a single investigative email and, when the Center for Student Conduct inquired about it in July 2024, immediately acknowledged it. The administration nonetheless issued the April 24 Notice — characterizing the conduct as "at least one"

spoofed email — with knowledge that additional accusations forming part of the underlying complaint had been unsubstantiated and subsequently withdrawn, and while omitting that the Academic Senate's grade-appeal process (COCI) had completed its review and found no improper academic procedure by Plaintiff. Forwarding disciplinary charges in reliance on a complaint the administration knew to be partly unsubstantiated, while omitting the faculty body's contrary determination, evidences bad faith and pretext rather than a legitimate compliance purpose.

148. On information and belief, before issuing or causing the April 24 referral, Defendant Inkelas and the Doe Defendants had access to, reviewed, or deliberately failed to review University records showing the prior Center for Student Conduct and Academic Senate grade-appeal proceedings, the withdrawn or unsubstantiated allegations, and Plaintiff's pending federal action.

149. As a direct and proximate result of defendants' retaliation, plaintiff has suffered and continues to suffer damages, including the burdens of defending against the disciplinary process, emotional distress, and reputational harm.

150. This claim is brought against Defendant Sharon Inkelas and Doe Defendants 1–10 in their individual capacities for damages. Defendant Inkelas, as the Chancellor's Designee, issued the April 24, 2026 Notice of Allegations and Referral to Committee on Charges. The Doe Defendants are additional individuals who participated in causing that referral, whose specific identities and roles will be developed through discovery and substituted by amendment.

151. Relief: On Count Eleven (First Amendment retaliation, 42 U.S.C. § 1983 — April 24 referral): compensatory damages; and punitive dam-

ages against the individual defendants where permitted by law, including upon proof of reckless or callous indifference to plaintiff's federally protected rights or actual malice. Plaintiff preserves all issues concerning California Government Code § 825(b) to the extent applicable.

**Reservation of Statutory Retaliation Claims Arising From the April 24, 2026 Referral**

152. Plaintiff's statutory retaliation claims under Title VII (42 U.S.C. §2000e-3(a)) and FEHA (Cal. Gov't Code §12940(h)) arising from the April 24, 2026 referral are reserved. Because the referral is a discrete act postdating Plaintiff's existing administrative charges, Plaintiff is exhausting it through a separate charge with the California Civil Rights Department and the Equal Employment Opportunity Commission and, upon receipt of a right-to-sue notice, will seek leave to add these claims — which, if added, would be asserted against The Regents — by a supplemental pleading under Federal Rule of Civil Procedure 15(d). The April 24, 2026 referral is pleaded herein as the basis for Count Eleven (42 U.S.C. §1983) and as evidence supporting Plaintiff's existing retaliation claims as the most recent act in a continuing course of retaliatory conduct.

153. **General Prayer — Punitive Damages on the Section 1983 Claims.** Plaintiff seeks punitive damages against the individual Defendants on all claims under 42 U.S.C. § 1983 for which punitive damages are legally available, upon proof that the individual Defendant acted maliciously, willfully, or with reckless or callous indifference to Plaintiff's federally protected rights. Plaintiff further preserves all issues concerning actual malice and

California Government Code § 825(b) to the extent applicable.

**Exhibits**

154. Plaintiff attaches and incorporates by reference Exhibits 1–24; under Fed. R. Civ. P. 10(c), these written instruments are part of this pleading.

Demand for Jury Trial.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all causes of action.

Respectfully submitted,

Satish Rao, Pro se.

## VERIFICATION OF COMPLAINT

I, Satish Rao, a citizen of the United States and resident of the State of California, declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 as follows: 1. That I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct. 2. Any allegations which are not subject to being stated with certainty were made upon information and belief. 3. I believe the allegations that I do not have personal knowledge of to be true based on specified information, documents, or both.

Executed on this ___________ day of _______________, 2026, in Berkeley, California.

Satish Rao

______________________________

Satish Rao