# LIST OF EXHIBITS TO THE THIRD AMENDED COMPLAINT

Exhibits 1–21 were filed with the Second Amended Complaint (ECF No. 38) and are incorporated herein by reference. Exhibits 22–24 are filed herewith.

**Exhibit 1.** Timeline.

**Exhibit 2.** October 11, 2024 Meeting of Chayes, Liu, and Rao.

**Exhibit 3a.** Rao merit review — Departmental Recommendation (Canny).

**Exhibit 3b.** Rao merit review — Dean Chayes/Liu Recommendation.

**Exhibit 3c.** Rao merit review — Budget and Interdepartmental Recommendation (Chaired by Plaut).

**Exhibit 3d.** Rao merit review — Vice Provost Broughton Decision.

**Exhibit 3e.** Rao merit review — Dean Chayes/Liu concurrence.

**Exhibit 4a.** Rao reconsideration — Dean Chayes/Liu Recommendation.

**Exhibit 4b.** Rao reconsideration — Budget and Interdepartmental Recommendation (Chaired by Plaut).

**Exhibit 4c.** Rao reconsideration — Vice Provost Broughton Decision.

**Exhibit 5a.** OPHD Investigation Report — Levien.

**Exhibit 5b.** OPHD Investigation Report — Canny.

**Exhibit 5c.** OPHD Investigation Report — Rao.

**Exhibit 6.** John Wawrznyek response to Dean Liu's request for information.

**Exhibit 7.** Questionnaire to Levien, Hunn and Kauer.

**Exhibit 8.** Rao formal complaint letter.

**Exhibit 9.** Dean Liu closing Rao's complaint.

**Exhibit 10.** Questions/Answers from Canny for questionnaire 1.

**Exhibit 11.** Canny discriminatory email thread, forwarded to Wagner.

**Exhibit 12.** Canny discriminatory email thread part 2, forwarded to Wagner.

**Exhibit 13.** Canny email with link to 250 pages of marked up email.

**Exhibit 14.** Link to google doc of Canny marked up Rao emails.

**Exhibit 15.** Top v4 salary adjustments.

**Exhibit 16.** 2022 Salary program for those in good standing.

**Exhibit 17.** APM 210: Appointment and Promotion.

**Exhibit 18.** Guidelines for preventing bullying.

**Exhibit 19.** Wagner email on retaliation, recourse, and 2021 salary program.

**Exhibit 20.** Wagner refuses to stop Canny's departmental review.

**Exhibit 21.** Email chain with HR VC Whitlock.

**Exhibit 22.** Plaintiff's December 7, 2022 letter to Vice Provost Plaut, with enclosures.

**Exhibit 23.** Vice Provost Plaut's March 30, 2023 Notice of Decision (OPHD Case No. 2021-UCB-00381).

**Exhibit 24.** Plaintiff's April 29, 2026 Request for Recusal to Chancellor's Designee Sharon Inkelas.

# EXHIBIT 22

Plaintiff's December 7, 2022 letter to Vice Provost Victoria Plaut,
with enclosures addressing the OPHD Investigation Reports
(Canny and Levien complaints) and retaliation

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO — SANTA BARBARA • SANTA CRUZ

Please Reply To: BERKELEY, CALIFORNIA 94720

Satish Rao
Professor
University of California, Berkeley
satishr@cs.berkeley.edu

December 7, 2022

Dear Vice Provost Plaut:

I am writing with regards to the Investigation Reports regarding my complaints to OPHD.

I attach letters addressing aspects of the two reports and a third discussing the relevance of retaliation for my complaint about false allegations from staff against me. This was the reason that I went to OPHD in the first place. It remains a continuing issue that for example resulted in a declaration in my promotion which in turn resulted to the loss of at least 13K in yearly income. The latter harm will occur in bulk for the remainder of my life given the effect on retirement income.

Furthermore, I point out then Vice Provost Angelica Stacy and/or then Provost Ben Hermalin specifically warned then chairs to not retaliate against Rao for his initial 2018 complaint and that the interviews make clear that this retaliation is continuing to this very day.

While I understand that this response is not intended to challenge findings of fact, I must do so, as the findings and indeed the process are problematic.

With regard to the allegations that one or more staff persons made false accusations against Rao. This is clearly true. There was contemporaneous written testimony in 2019 by a witness who carefully stated what staff member Levien said. Levien never denied that to the Chairs who investigated, nor denied that in written questions that were provided to her at that time. Only now does she deny it, but even now she makes new false allegations that Rao is "derogatory" to Black students through hearsay from what should be termed a co-conspirator, Chris Hunn. It is notable that Hunn refused to be interviewed.

Thus, it is problematic that the CRO chooses to absolve Levien of painting Rao as a racist, with the evidence submitted years ago by Warznyek and re-attested to here. Moreover, Levien is unequivocally continuing to claim Rao is anti-Black, which most would consider to be racist. That is, she did and continues to make false allegations to paint Rao as biased against certain ethnicities or races.

I will say even if the staff retaliation that continues to this day is not deemed actionable under anti-discrimination protections, I would expect Rao to get some protection from his rights as laid out in the Academic Personnel manual.

With regard to the allegations against Canny that he discriminated against Rao. The facts are simple; he told Rao he was discriminating against him in an email. That same email egregiously challenges Rao to reveal his caste. Moreover, in that email, he proudly announces this is due to his commitment to anti-racism. In the CRO interview, he expands on this commitment and continues his views that Asian's dominate the faculty. Moreover, he makes further contends that Rao is "anti-Black" using provably false allegations that Rao assigned a racist project. One notes that Canny also continuously harassed Rao up to, being warned to not impinge on Rao's academic freedom. Ultimately, he argued that Rao should be decelerated using anonymous and non-specific accusations that were forwarded by staff due to Rao's complaint about their provably false allegations.

I will say Canny is a bully of the first order who did not get the full four years in the Chair progression. Mostly one can ignore it as faculty, but when he is then provided an avenue through promotion to inflict harm, he takes it. Moreover, Rao complained to the new Chair, David Wagner, and asked that Canny's evaluation be withdrawn.

Indeed, Rao provided the email to Chair Wagner where Canny proudly proclaims that he is discriminating against Rao. Rao asked that Canny's evaluation not be forwarded for this and other reasons. While Wagner did apologize for Canny's words, he did forward this retaliatory evaluation which resulted in Rao's deceleration. The notion that someone who proclaims that he is discriminating against someone and then evaluates that person harshly is allowed to do so is wrong.

Finally, I have to say that while the CRO finds various witness credible, I would disagree. There is a pattern of not remembering, or "I didn't pay any attention" by several people including the Chairs responsible for investigating these behaviors. For example, former Chairs Demmel and Bokor repeatedly don't remember meetings with Rao. But Rao provided affidavits to those Chairs contemporaneously that detailed the meetings and asked for any corrections or inputs to his description. These affadavits were provided to the CRO along with the dated emails showing they were provided to the Chairs. One wonders why those affadavits were not simply shown to the Chairs to remind them.

Indeed, I consistently made writings to preserve a record throughout this process, and provided those writings to all involved including the OPHD. And I also provided all emails regarding this incident to the CRO. I am not hiding anything and I made efforts throughout to memorialize all interactions for everyone's sake. Others seem intent on hiding things or looking the other way.

Moreover, it is dissappointing to read Witness after Witness say they don't know what happened, but then conclude that Rao is on the wrong side of things. If one claims to not understand a situation and specifically to not paying attention, one should not pass judgement.

In any case, I heard you when you said this response is for me to ask for what I want to resolve this issue.

I have always, apparently hopelessly naively, thought the truth resolves these kinds of things. Indeed, the whole issue here exploded as the Chairs charged with resolving this did not seek the truth and tried to paper over and eventually coverup the issues. For example, they avoid at all costs the specifics of Levien's accusations and simply assert that they were not what they clearly were; an attempt to paint me has biased towards certain races and ethnicities. Early on, Rao's only ask was for truth and reconciliation; but wanted the truth. Indeed, Rao's advanced questionnaires that could have simply have been answered and a meeting could have been held for reconciliation as necessary and we could move on.

Instead, the situation became inflamed where staff who previously with whom I worked mostly very well with (according to their own testimony) are now incredibly hostile. Moreover, they retaliated by forwarding anonymous, non-specific claims that I was mean to them or more politely "unprofessional". There is no evidence of this, at least not any evidence of specific behavior that Rao can defend against. That was then jumped on by Chair Canny to harm Rao's conditions of employment both in his work assignments and in his promotion.

Indeed, recently, I received a notice of allegations from OPHD regarding a student who alleges that I did not give her an incomplete in Fall 2020 where other male students did and did so due to her gender. I think it is easy to defend as her semester, I happened to mostly gave incompletes to (apparently) female students, the complainant didn't ask for an incomplete, and she had finished the full course including the final so an incomplete is not appropriate. Still, I can't help but wonder if (a) these allegations will be fairly investigated given the treatment I have received from OPHD, and (b) whether some members of our staff encouraged her to file this complaint.

It should be noted, I teach a course every semester with 800 students. Indeed, usually it is a course that is used to determine entry into the major and as such students are stressed about every aspect of the course. I try hard to manage that stress and keep them focused on learning the material. But if they do believe that I am racist (as the staff paint me) or now that I am sexist, my every move will be darkly interpreted and the students will suffer. As for me, the exposure is immense. Definitely not a safe space in an environment where the staff is actively hostile.

To be sure, I am frankly confused on how to solve this problem.

How do we get to the truth? I don't know. I am happy to participate in any process that gets there productively

so that I can again work in a productive and mutually respectful relationship with all involved.

On the other hand, I do believe one can address the deceleration and the heinous inclusion of Canny's departmental recommendation in my file and fruits of the poisoned tree of the resulting promotion process that resulted in my deceleration and loss of 13K. One solution to that could perhaps just give me the full step promotion and remove the offending material and its offspring from my personnel file.

I would very much like to have the full promotion and resulting increase in salary. Still, it is frankly only a part of the harm that has been and continues to be inflicted on me.

I am happy to hear of avenues to address the past harm and to alleviate the continuing harm.

Sincerely

Satish Rao

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO    SANTA BARBARA • SANTA CRUZ

Please Reply To:    BERKELEY, CALIFORNIA 94720

Satish Rao
Professor
University of California, Berkeley
satishr@cs.berkeley.edu

December 7, 2022

Dear Vice Provost Plaut:

Please consider this a response to the Office for the Prevention of Harassment and Discrimination's report entitled "Investigation Report Re Canny".

First, we thank the Complaint Resolution Officer for their hard work on this case. While we strongly disagree with the conclusion for reasons we set forth, we thank them in particular for their tremendous efforts at shedding light on the situation and the thought they put into this report.

Still, I strongly disagree with the scope of the Investigation and the conclusion of the Notice of Outcome arrived at in the report.

1. Rao's complaint, brief, and submitted materials alleged a hostile environment that entailed exclusion from committees and a denial of promotion in addition to facing false unspecified allegations. Indeed, Rao has faced, for example, the "outrageous" behavior from Canny who questioned Rao's caste and in openly, even proudly announcing that he was discriminating against Rao in denying his membership on a committee.[1]
2. The exclusion from that committee itself was *explicitly* discriminatory according to the Respondent Canny's own language to Rao in a series of emails. The point is reiterated with clarity and force. In speaking with the CRO, Respondent Canny explicitly reiterates that "racist" behavior is an appropriate action to the CRO in the context of this committee. Moreover, those of Rao's ethnicity are not on the committee even while Caucasian descent are despite the relative paucity of faculty in Rao's position. Thus, it is confusing that the report concludes that Canny did not do so for discriminatory reasons.
3. Canny admits to lying to Rao, then confirms his belief that being racist to Rao is appropriate, but then suggests other reasons for denying Rao membership. Canny admits to lying to Rao on another occasion and moreover makes a number of false accusations one of which is used to support a charge of "racist thinking" against Rao. The conclusion that Canny is innocent requires a intricate reasoning which would defy a normal reasonable person who would take Canny's declaration to Rao that he is discriminating against him at face value. Particularly, when Canny engages in outrageous exploration of Rao's descent, specifically his caste.
4. Canny continued to argue for deceleration of Rao in his departmental recommendation due to Rao's "unprofessional behavior" without specifics though implying that it involved his speech. Canny provides no specifics of any speech or unprofessional behavior. This is a continuation or Canny's persecution of Rao in contradiction of Rao's academic freedom as well as perhaps First Amendment issue.

Rao's initial complaint was about the hostile environment which was detailed in a document entitled "brief" submitted to the Office of Prevention of Harassment and Discrimination (OP'S). While the Notice of Allegations is narrow, Rao's complaint was not. The Notice of Allegation provided no avenue for Rao to reiterate his broader claims. The investigation makes clear, however, Canny's brutal focus on ethnicity and in particular his focus on

[1] This characterization inappropriately narrows the discussion to the exclusion from one committee when the impact has been large and brutal and continues.

those of Asian descent. There is no situation where such a person should evaluate a supervisee who he openly discriminated against for promotion. Indeed, the evaluation itself is a hit job with no specific facts to be falsified. Given Canny's admitted lies and demonstrable mis-statements in his testimony in this investigation, it becomes even more problematic.

We will continue with a discussion of investigation and we will address the witness testimony.

Rao-Canny email thread. Canny email:

**Actually an Indian faculty member from a scheduled caste would be very good for this committee. I'm sorry if I got things wrong, but I had assumed that you (and our other Indian faculty) were not from that group.**

Rao email:

**If you don't want me on the committee, you should come up with a reason that is not discriminatory.**

Canny email:

**That's discriminatory, yes. Its [sic] also important to be able to listen and hear what people are trying to say. I gave you a reason. Yes, it was discriminatory. So is racism, but also so is anti-racism. I don't [sic] have any other reasons to give.**

Here, the Chair explicitly tells Rao that he is discriminating. In his interview with the CRO, he doubles down and states:

**CRO referred to Respondent's statement, "to make progress in race/gender/caste issues, it[']s important to be able to talk freely about race, and to make some decisions based on race. That's discriminatory, yes" and asked what part is "discriminatory." Respondent replied, "The decision based on race is superficially discriminatory" and is "based on Ibram X. Kendi's [author of How to Be an Anti-Racist] statement that *"you have to be racist to be an anti-racist."***

Thus, it is quite clear that he meant that "anti-racism"'s cure is racism against selected enthnicities.

In this instance, both the email itself proclaiming that Canny is being discriminatory and that his interview with the CR0 makes clear that Canny is being discriminatory and believes this to be appropriate.

To be sure, this belies his previous discussion of lived experience to which Rao attempted to respond. While Rao acknowledged that he has not suffered from the hateful, open racism that he saw directed towards African-Americans, he argued that he had long experience with being in a distinct minority; for example, the only person of Indian descent (with the exception of his brother) in all his schools throughout his K-12 education. One might think this is someone who understands the issue of "belonging" for those who are in a distinct minority.

Canny then claims his email is a lie.

**Respondent added, "I was just in a hurry and wanted to get out of a tussle with [Complainant]."**

In this, Canny goes the other way and defends himself by proclaiming even appearing to be proud that he lied to Rao.

That is, he fully acknowledges that he tells the supervisee that he is denying him a position due to discrimination and being "racist". He does so directly and brutally to the supervisee.

But when asked later by the CRO, he both suggests you have to be "racist to be anti-racist" but then suggests there are other reasons. That is, he proudly an fully believes discriminatory behavior is appropriate.

It is surprising the CRO accepts this, given that Canny openly admits to repeated dishonest behavior and indeed that he appears proud of being racist.

Regardless, of which story is true, the direct attack on the supervisee by probing their caste and by shutting them down with open discrimination clearly establishes a hostile environment for Rao.

**New false allegations by Canny.**

To be sure, he makes other false assertions. One example, is that Rao has "racist thinking" and falsely made the outrageous claim that Rao had assigned a racist project. Rao did no such thing. Indeed, on Rao's own, he had responded proactively to offense brought on by one line in course slides that he neither made nor presented in an 800 person course. Moreover, these slides themselves have been used for many semesters previously by the normal instructors.[2] Indeed, Canny goes further and accused Rao of trying to break the anonymity of the complainer when the opposite is true. Canny's attacks are as relentless as they are false.

As to the Canny's view of Asians, we can examine this particular proclamation:

**Canny's focus on Asian's.**

**Respondent said by "majority," he meant the EECS faculty is mostly "Chinese, Japanese, Indian, and Caucasian"**

To be sure, the EECS faculty is mostly Caucasian at 64% to 32% Asian according to calanswers. In the CS Division of which Canny was the chair, the numbers are far more Caucasian. While this is not completely straightforward due to people being, for example, from Iran or Israel, it appears that in full-time professor titles in the CS division, in terms of ethnicity, 52 Caucasian are 3 East Asian, 9 South Asians, 3 African American, and 3 Hispanic. (I have a list of names with enthnicities but it feels gross, but can provide upon request. For what its worth, Rao is the only South Asian descended CS professor who was raised in America: South Asians were extremely rare at the time due to legal restrictions put in place in 1917 for Asian immigration in place until 1965. There is another one in EE.)

In any case, Canny's proclamation regarding "Chinese,Japanese, Indian and Caucasian" enthnicities appears to be all too focused on those of Asian descent and not focused on the real majority which is the ethnicity to which he belongs.

Moreover, the known members of the Committee at the time were Professor Fox and Professor Canny who are Caucasian. The current membership of the ARC committee is entirely Caucasian and includes John Canny. It includes zero person's of color.

**Is Caste an appropriate discussion topic?**

Regarding Canny's discussion of Rao's caste, Chair Bokor (Witness 8) himself suggested:

"Regarding the allegations CRO asked Witness Eight if he was aware of Complainant saying anyone had asked about or referred to his caste, and he answered, "Never heard that. I would remember that because it would be **egregious and highly unprofessional and irregular.**"

**Further Harassment.**

Furthermore, it clear that John Canny targeted Rao as a matter of course and upon information and belief that Bokor corrected his behavior regarding his harassment. When Canny marked up 250 pages of emails involving

[2] Rao jumped in to a course he does not normally teach so the materials, projects, assignments were not his own. He presented material, helped with exams, graded, dealt with the enormous amounts of academic misconduct that occurred in that first semester under Covid where exams were not allowed to be proctored.

Rao, Rao responded copying Bokor noting that this was harassment, upon which Canny no longer responded. One expects that Chair Bokor intervened as Canny acknowledged Rao's rights:

**Respondent acknowledged that Complainant's posts may be protected by free speech.**

To be sure, the issue may be a combination of academic freedom and free speech. Moreover, it is important to note that the discussions that Canny marked up were largely carried out on an email list specifically established for faculty conversation (eecs-profs-general) about whatever subject not on the official eecs-profs list. There were many participants, especially during covid. There was much to discuss and understand.

**Canny's embracement of being "racist to be anti-racist.**

In any case, Chair Canny's has given his full-throated endorsement of being "racist to be anti-racist" and his view that those of Indian descent are part of the problem. Moreover, Canny's expectations that Rao "be humble" (see page XXX) with respect to Canny's demands that Rao include offensive language in an apology letter is extremely problematic. It indicates his feelings of his own superiority in terms of understanding all things and indeed he expresses irritations at Rao's attempts to explain himself. In particular, Rao protested that using a term that is offensive in a personal apology re-injures those affected by the term in the first place. Rao doesn't believe a lack of humility or even stubbornness should be inferred from Rao's preference to not offend further and his explanation of that preference.

**Rao: attack's and background.**

I should address Canny's earnest embrace of anti-racism, and perhaps an implied resistance by Rao. To be sure, Rao has a long-term focus on the particular injustice faced by those of African descent beginning with his time in Texas and through readings even as a child he read Claude Brown (as many American children were required to back then) and on through Malcom X, and Ralph Ellison. The image of making white paint more white by mixing in black paint endures. In more modern times, one, of course, follows Henry Louis Gates, Cornell West, and Ta Nahisi-Coates, the son of a black panther. To be sure, I do point out the statue of Huey (the chief theoretician of the Panthers) when I drop off my kids or others at the West Oakland Bart. Indeed, it is part of a long history that Rao has and continues to follow.

To be sure, I also acknowledge facts, evidence and arguments that do not agree with my position and sometimes discuss them at length, e.g., I was passionately against the Clinton Crime Bill and even their Welfare reform efforts even while acknowledging the very real breakdown caused by crime and generational issues around employment in disadvantaged communities. I appreciate Canny's intentions, and believe mine are in the same vein, but I have been passionate for all my life not just recently, and have read broadly, thus, I may not take all my guidance from currently popular sensibilities, nor do I reject arguments which are not consistent with my partisanship. Canny has more than once in his testimony and essentially constantly for a period as chair pushed a rather one dimensional view of this issue and views those who don't get completely onboard with suspicion. To be sure, Canny's nature often leads him to term disagreement with him as not being sufficiently "humble".

Even Canny's embracement of being "racist to be anti-racist" is misplaced and lacks texture. The clear application of this statement is affirmative action, or compensation for those of the ethnicity that from the discrimination by the veterans administration in terms of housing, or even reparations as Ibram X. Kendi argues in his writings. These are fine applications which I very much agree with, but I don't believe the quote from Ibram X. Kendi is meant to be used by a white and aggressive chair to exclude a person of color from any position at all.

Throughout the testimony of others there is indication that Rao can be passionate even while admitting that Rao uses evidence and solid arguments to support those passions. Also uniformly the witnesses state that Rao is an advocate for students, and even his anger with the administration is in their diversion of resources away from our

mission of serving them. They also indicate that Rao "uses data". I would suggest that indeed I tend to go on in order to cover some of the complexity of these issues as one may read here. This, at times, annoys others in particular Armando Fox. But faculty can annoy each other at times. It's not a crime, indeed, it is part of the job.

From various witnesses, there are also numerous statements which "shame" thrown in such as a number of years ago, including third hand allegations of "drunken" behavior. Some specific ones are a number of years ago and could be addressed in some detail, but they seem dug up at this point. There are non-specific ones as well, such as he is "loud" or "unprofessional". They appear to range from impressions and second hand or worse reports. Specifically, Denero couched his words regarding Rao's removal from the Undergraduate Study Committee with ".. speculating..." The one perhaps recent incident that is specifically referred to during committee service is that Rao "took apart a faculty colleague's proposal with logic" and the faculty member left the meeting. Logic is not particularly "unprofessional", and Rao doesn't recall a faculty member leaving a meeting in anger ever.

**Conclusion.**

I apologize for going on about my character, but there are many pages of people being asked to go on about my character and responding seems appropriate.

In any case, in addition, to Chair Canny confirming his support for racist behavior (albeit for the sake of anti-racist behavior) directly to Rao and also to the CRO, and crossing any reasonable standard of behavior of language for a supervisor, he was allowed to then pursue his vendetta through the tenure and promotion process.

There is no excuse for such a person to evaluate the target of such an attack for promotion or have any supervisory role. This incident was brought to Chair David Wagner prior to the forwarding of Chair Canny's dishonest, hit-job of an departmental evaluation and Chair Wagner acknowledged the discriminatory behavior in email to Rao and refused to intervene. Wagner fully understood that Canny's behavior was a serious issue, even consulting campus before apologizing to Rao for that behavior. Wagner should never have let Canny's recommendation go forward.

The hostile environment established by "closing up of ranks" which is evident throughout the interviews is clear.

Again, Chair Canny probed Rao's caste which by any measure is egregious, and then Canny explicitly proclaims that discriminating against Rao is in the service of anti-racism. He further fully endorsed the notion that one should be racist to be anti-racist to the CRO and indeed many other settings. Indeed, he explains that he did not want "majoritarian" people on the committee. And then he denies this has anything to do with his treatment of Rao for the purpose of membership to the committee.

Moreover, Canny explicitly acknowledges lying on at least two occasions, with respect to his explicit racism and his acknowledgment that Rao was attacked unfairly. Canny further advances a theory to the CRO that Rao engages in "racist thinking" making the *demonstrably false* allegation that Rao assign a project which was racist in a class.

To boot, both he and Professor Fox are majoritarian. While Fox is from a Spanish-speaking culture, he is not identifiable by his skin color unlike Rao who could hide his differences throughout his life is made plain by his skin color.

To be sure, even now the anti-racist committee appears to have *exclusively European heritage*. One might think this is exculpatory with respect to Canny's use of race in determining committee membership, but perhaps it is just that he thinks that Asian or specifically Indian descent are somehow those who one should be racist toward in the name of anti-racism. No need to screen for white people. In any case, the irrational and his proclamations about his own dishonest behavior, and his further false statements should not be of value as a defense in these matters.

Furthermore, Canny (who witnesses were not asked about specifically), he clearly bullies Rao beyond his explicitly discriminatory behavior though perhaps due to his bias, e.g., his reluctant admission that his intervention into

Rao's emails encroached "free speech" issues when confronted for it. [3]

To be sure, Canny's tenure as chair was extremely short. He lasted for two years, in the CS position that typically runs for 2 years and then almost universally progresses to being the EECS chair for another 2 years as illustrated by Witness Bokor's and Demmel's testimony. His bullying behavior was certainly not just directed at Rao nor was it explored by the investigator, but his discriminatory behavior was certainly directed at Rao. There is a sense that Rao should not be the last person to suffer due to the mistake of placing Canny in a position he was not equipped to be in.

In sum, Canny acknowledges his dishonesty proudly (i.e., lying as a management technique) and makes other false allegations in his testimony, it is thus the wrong conclusion to clear him of discriminatory behavior based on his incoherent claims and accusations. Moreover, it is incorrect to avoid examination of the extremely hostile environment that Rao faced from Canny and instead have pursued the narrow issue of membership to a single committee. Specifically, Canny should never have been allowed to be involved in an employment action given this history and indeed the subsequent chair being informed of Canny's action should have quashed his negative comments in the departmental recommendation for Rao's promotion case. This all adds tremendously to the hostile situation that Rao continues to suffer in and has caused significant harm to Rao's compensation, career progress and well being.

(I apologize for using the third person at times. It alleviates, a bit, the personally extremely painful nature of all this mess.)

I respectfully submit these arguments for your consideration.

Sincerely

Satish Rao

---

[3]From Canny's interview with the CRO, it appears that when Rao complained about Canny's harassment regarding these emails, that EECS Chair Bokor suggested he stop the harassment due to Rao's right of academic freedom.

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO | SANTA BARBARA • SANTA CRUZ

Please Reply To: BERKELEY, CALIFORNIA 94720

Satish Rao
Professor
University of California, Berkeley
satishr@cs.berkeley.edu

December 7, 2022

Dear Vice Provost Plaut:

Please consider this a response to the Office for the Prevention of Harassment and Discrimination's report entitled "Investigation Report Re Levien."

First, we thank the Complaint Resolution Officer for their hard work on this case. While we disagree with the conclusion and the reasons as we set forth below, we thank them in particular for their tremendous efforts at shedding light on the situation and the thought they put into this report.

We disagree with the analysis section of the report. We also note the retaliation aspect of this case which the CRO agrees happened.

**Evidence on the conduct**

We specifically disagree with the assertion that "the evidence DOES NOT establish that Respondent engaged in the conduct as alleged in the Notice of Allegations". The allegation in the Notice is as follows:

"Specifically, you alleged that Respondent #2 discriminated against your race and created a hostile environment for you when she told others that your data analysis would be biased and you would misuse the data to support an argument that underrepresented minority students should not be admitted because you are Asian."

Specifically regarding the fact that "she told others that your data analysis would be biased and you would misuse the data to support an argument that underrepresented minority students should not be admitted."

In the section beginning on page 69, entitled **Did respondent assert a concern that Complainant was biased and would misuse the data?**

The section concludes with:

**"Respondent denied saying Complainant was biased, and other than Witness Thirteen, no witness heard that she said that. Based on a preponderance of the evidence, CRO finds Respondent did assert that Complainant would misuse the data but did not assert that Complainant was biased."**

To be sure, Witness 13 is far more believable than Levien as he has no incentive to say what he did, Levien had many opportunities to say she didn't say it previously, and Levien continued to assert that Rao is biased in her interview with the CRO specifically asserting that Rao repeatedly makes outrageous derogatory statements about Black students. Thus, Respondent continues to advance (false) allegations that falsely paint Rao's as biased, specifically that support a charge of racism against Rao, specifically with respect to Black students.

Thus, the conclusion is not supported by the evidence nor by the interviews.

(1)John Wawrznyek (Witness 13) testified contemporaneously in writing to the Dean in 2019 that Levien did say Rao would "misuse data" had "shown bias" and that Rao had "argued that URMs should not be admitted". Attachment A. The latter is explicitly behavior that discriminates based on race and/or ethnicity given that URM's

are classified as such by race and/or ethnicity. Moreover, Levien offered this false allegation in order to support her contention that Rao would "misuse data" and shown bias.

(2) There is no reason for Wawrznyek to make this up. Indeed, he said the same to Rao previously in 2018, to determine whether Rao was biased against URMs. This is a difficult position which Wawrznyek would have no reason to manufacture. Indeed, Levien's accusations Wawrznyek to investigate whether Rao had indeed done what Levien alleged before allowing Rao to be involved in analyzing data.

(3) Levien, in contrast, did not deny Wawrznyek's statement when interviewed by the Chairs in 2019 and moreover refused to answer questions in 2019 that were narrowly targeted to address Wawrznyek's original writing about the incident. While these questions have been unfairly painted as problematic, they are very focused and narrow and give Levien an opportunity to simply say "I did not do that" or to explain why she did, if she did acknowledge the behavior. The questions are precise and careful to get at the truth not to establish a legal case. Indeed, if Levien had simply told the truth immediately there would be no harm that Rao could pursue in court as it would simply have been a sequence of miscommunications and misunderstandings with limited impact. The lack of being forthcoming and Levien's retaliation over these years is what makes this so harmful.

(4) In Levien's interview with the CRO, Levien continues to paint Rao as anti-black which most would consider to be racist. Specifically, Levien states the following:

*Respondent said she was also concerned about things Complainant said in meetings that made it seem he "didn't care about URMs." Respondent said Complainant* **said "some outrageous things about out our Black students"** *during an Undergrad Studies Committee meeting. She added that she was not present when these remarks were made, but she heard about them from EECS Faculty One, another staff member. Respondent stated she could not remember if EECS Faculty One told her what the specific comments were as "it's been three-and-a-half years" but she recalled he indicated* **Complainant "didn't have a favorable opinion of our Black students."** *Respondent said she didn't know if that opinion was based on the students' performance. CRO asked Respondent if she recalled if EECS Faculty One said that Complainant used* **derogatory terms when he talked about the Black students**, *Respondent answered, "That was my sense of it."*

*Respondent said the date of this conversation with EECS Faculty One "would have to be in December 2018." She said she talked to him in person and told him about the incident with Complainant regarding his data request, and EECS Faculty One said, "Oh, here's my experience" and told her about Complainant's remarks about Black students.*

*Regarding Complainant's claim that Respondent told others in the department that she was concerned about a previous presentation Complainant provided, Respondent stated, "Never said that," and "I don't know what he's talking about."CRO asked if she recalled anyone talking about Complainant's previous presentations, and Respondent replied,* **"No. Just [the] heinous things he said in an Undergrad Committee meeting."**

Thus, while Levien denies saying what Wawrznyek has consistently stated, she also then argues that Rao repeatedly disparages our Black students using hearsay from "EECS Faculty One."[1] Specifically, in the interview itself Levien paints Rao as biased against "black students" with statements like "didn't care about URMs" and said "some outrageous things about our Black students" and "didn't have a favorable opinion of our Black students."

Thus, not only is Wawrznyek's specific version more believable, in her interview itself, Levien argues that Rao repeatedly makes inappropriate and damaging remarks about black students. The interview itself paints Rao as a racist, which is exactly Rao's allegation and the the CRO's somehow relieves Levien of responsibility for.

[1]For the record, EECS Faculty One is a misidentification as Christopher Hunn is on staff, reports through the staff management hierarchy.

For the record, this is non-sense. Rao does not talk about students or their performance with respect to characteristics such as race, ethnicity, gender, or anything else as it is improper. Christopher Hunn (EECS Faculty One) tends to view things through this lens. Rao feels it is damaging to equivocate struggling students with race or gender and indeed, in Rao's experience, struggling students pretty much reflect the demographics of the class overall, where Chris Hunn tends to push the conversation there.

Even if one believes Levien's new assertions, they are an accusation (based on non-specific hearsay) that Rao is "anti-Black", in her own words. This is clearly painting Rao as racist, without using that word. It is exotic to claim that an accusation that Rao is "anti-black" is not an accusation that Rao is biased and indeed an argument that is meant to paint Rao as a racist.

While this technically may not be slander as perhaps Hunn (EECS Faculty One) really did communicate all of this to Levien. But there is no evidence of that, indeed, there is some evidence against that.

(5) Regarding Chris Hunn (identified as EECS Faculty One) who Levien claims suggest Rao is "anti-black", Susanne Kauer (Witness 4) specifically states that the following about one relevant conversation:

**Witness Four said that in January of 2019, she learned that the Dean had emailed EECS Faculty One to ask questions about Complainant. Witness Four said when she asked EECS Faculty One why the Dean contacted him, he referred to their October 2018 meeting where he told Witness Four about his "intense conversation" with Complainant. She said EECS Faculty One then gave her more details about the interaction. She said he told her that as he and Complainant were walking out of an Undergrad Studies Committee meeting, they discussed how students fare when they come to the EECS program, student performance, and underrepresented students. Witness Four said EECS Faculty One shared that he and Complainant had "differing opinions" on the issues, and when EECS Faculty One cited some research on student performance and demographics, Complainant became upset, started to yell, and stated, "Liberals have ruined education for minority students." She said EECS Faculty One explained that they were outside, and that "people started to look at us to check the situation." Witness Four said EECS Faculty One told her Witness Nine (a faculty member) was one of the people. She said EECS Faculty One repeated that he "remained professional."**

To be sure, this is not nice and a mischaracterization of what Rao said[2] but ultimately the discussion was not about UC Berkeley students, it was after the meeting and tangential, and there is no "anti-Black" sentiment that was asserted even by Hunn ( EECS Faculty One) despite Hunn's anger that he didn't get the class approved at the undergraduate study committee meeting.

This is very different than Heather's reporting of what Hunn (EECS Faculty One) said.

Moreover, Kauer (Witness Four) who has no problem accusing Rao of many things including drunkenness (through hearsay) and talking to himself, so she is not per se anyone who is on Rao's side.

Thus, there is no evidence that Hunn (EECS Faculty one) ever said Rao made derogatory comments about Black

[2]When Hunn began talking about various programs *after the meeting*, Rao noted that Berkeley High, where such programs are repeatedly deployed, the achievement gap for African Americans and White students is the among highest in the state. Moreover, Rao discussed evidence that, ironically, liberal districts in general do worse with respect to the African American-White achievement gap then conservatives. What Rao was trying to say is that results matter, not just trying. Moreover, it was a tangential conversation after the meeting where Hunn's proposal was rejected by the faculty and Rao was trying to explain and then Hunn went off into issues of race which the meeting was not about and Rao simply responded with his four year experience at Berkeley High working on the achievement gap and the extensive research where he had read in the issue that many programs are ineffective in schools at closing that achievement gap. Rao's point is that results are what matters, not good intentions.This information was provided to the CRO through an affidavit attached that was given the Dean Liu in 2019 immediately after Rao reviewed Wawrznyek's written testimony about Levien's accusations.

students. Yet, Levien re-asserts that Rao did many times in her interview with the CRO and paints Rao as hostile to Black students. Thus, she continues to push a narrative that Rao is biased based not on any experience she has witnessed and indeed based on hearsay from Chris Hunn who did not say such things to others who were interviewed.

(6) Chris Hunn (EECS Faculty One) seems to be the source of Levien's initial allegations (e.g., "Rao proposed not admitting URMS") and her new allegations (Rao makes "outrageous" statements about Black students) that clearly paint Rao is biased against Black students.

Yet, Hunn refused to cooperate. Indeed, he too could have cleared this up by answering the questionnaire that was advanced in 2019. Given that Hunn has had some medical issues, this may be understandable. Still, Hunn continues his job as Director of Undergraduate studies and his additional duty as a lecturer for a pedagogy class.[3]

Not interviewing Hunn given his central role in all of this is problematic. His refusal to be interviewed suggests his anger at Rao with respect to other matters (e.g., the undergrad committee did not approve a course offering he was pushing for in that meeting) led to his various denunciations of Rao to Levien and perhaps others.

His refusal to answer questions regarding what he said contemporaneously and again now suggests he has long been hiding from taking responsibility for his spreading of harmful falsehoods about Rao.

(7) Regarding the actual interaction with Chris Hunn, Rao provided an affidavit to the Deans and Chairs in early 2019 about the undergraduate study committee and the subsequent conversation with Chris Hunn. It was included in his submission to OPHD. As such, it should be given weight.

**Discussion of CRO analysis.**

We address the CRO's examination of Rao's allegation that Levien paints him as a racist.

**The CRO analysis uses the contention Levien didn't say "Rao is racist" as exculpatory from the allegation that she paints Rao as racist or biased.**

Specifically, the CRO excuses, in part, Levien due to her not specifically say "Rao is racist". Indeed, she specifically asked several witnesses to see if Levien used exactly the word "racist".

While Levien may not have said that specifically, Rao's complaint from the very beginning including his initial one in 2019 which is attached to the investigative report is that Levien has painted Rao as a racist.

What she said to Wawrznyek that Rao had "shown bias" and that Rao advocated "not admitting URMs" is a discriminatory action and thereby paints Rao as a racist. Her interview with the CRO, suggests Rao makes outrageous and derogatory comments about Black Students, which also paints Rao as a racist.

Thus, Rao's consistent contention that Levien painted Rao as racist not that she said the exact words: "Rao is racist." Rao never claimed that, and it is wrong to imply that Rao did. Moreover, it is not relevant to the clearly correct allegation that Levien painted and indeed continues to paint Rao as biased against specifically, at this point, Black students.

**Reasons for Rao's belief that Levien (and Hunn's) false allegations are based on bias against Rao.**

Regarding Rao's continuing concerns about the reason for these false allegations being bias against him. They were based on Levien's statements on the inclusion of another American of Indian descent as inappropriate for

[3] One believes this additional position as lecturer is why he is mis-classified as Faculty. Faculty here means Professor, tenure-track, or LSOE and reporting through the academic hierarchy. Hunn reports through the administrative hierarchy.

analyzing data. Furthermore, Rao was accused by Hunn (EECS Faculty one) of being anti-affirmative action in his interview with the Chairs on this incident in 2019. In combination with the inexplicable nature of these allegations, Rao felt that these judgments by Hunn and Levien were possibly informed by stereotypes around Asians being against affirmative action, in particular, the case that was active then and has now continued to the supreme court. While Wawrznyek does not remember that Levien argued that another American of South Asian descent should not be allowed to use the data, Rao did give written testimony to that conversation contemporaneously. [4] Still, Wawrznyek has kept an email record which could be accessed, and Rao believes with reminding, he would remember the discussion of membership of the data committee with Levien. The CRO should have pursued that email thread.

For what its worth, Rao happens to be pro-affirmative action and have been for my entire adult life, though this is not relevant. The fact that accusations about Rao being anti-affirmative action were forwarded is relevant. An interview with Hunn (EECS Faculty One) is really in order. Indeed, that many accusations are hearsay from him, he should have been included as a target in the Notice of Allegations.

To be sure, I did raise the issue of bias with the Dean, though awkwardly. Given that I sincerely believe and continue to believe that the superiority that Hunn and Levien believe they have with respect to attitudes on race over Rao is based in part on Rao's ethnicity.

To be sure, the frame here is well put by Williamson( Witness Two, the top Staff Manager), who is of East Asian descent, stated:

**She said that when people ask where she's from and she says Long Beach and they ask "where are you really from?," they mean she wasn't born in the U.S. She described this kind of exchange as a "microaggression" and "subtle discrimination."**

This is common for me too. Indeed, I have a standard response when asked my origins which is some variation on "I am from Texas, and my parents are from India, I have been here since I was two years old. Indeed, I don't speak my parent's mother tongue. And so on." It's not per se a problem that people are curious, though it is a bit extra that one has to do growing up as the only person of my descent in almost all contexts. Its fine.

On the other hand, when white people explain race relations to me and accuse me of not being sympathetic or even "anti-Black" either out of their superiority in understanding the situation of those who are not advantaged or simply some other stereotype being applied due to assumptions about Asian or Asian American attitudes around affirmative action. And moreover, argue that I should not be allowed to do my job, which in this instance was to analyze data, the aggression is no longer "micro".

To be sure, as noted Levien believes others who are of European descent are also not up to snuff with respect to protecting URM's. Thus, it is perhaps Rao's position as faculty that makes him inferior in this respect. But, as the theory of intersectionality goes, one can have many reasons for an opinion. Here, the stereotype and assumptions based on my ethnicity do appear to me to be part of her reasoning as she singled me out repeatedly as biased and against Black students while being less aggressive towards those of European descent.

I raised this concern to the Dean. This should have protected me from the retaliation that Levien and other staff have undertaken over these past four years that have resulted in my demonization among staff and even my deceleration.

### Asian Character?

While Rao was not aware of Levien's PHD Work on, in her own words, "Asian Character", her description does

[4] Note that Rao could have reminded Wawrznyek as he does play golf with him, but has avoided speaking to Wawrznyek on the specifics of the issue. Rao does not do so out of an abundance of caution about inappropriately influencing a witness.

seem relevant as a frame.

Given the long history of Europeans assessing 'Asian Character' for their own purposes which includes hundreds of years of imperialism in East and South Asia, this framing is problematic.

While Levien is not an imperialist, she appears to believe it appropriate to assess Asians as a group. And she clearly believes herself superior to many faculty especially Rao and the other South Asian she viewed as inappropriate, in terms of knowledge or sympathy towards URMs. She did not raise those objections about European descended faculty in terms of analyzing data.

To be sure, Levien's interview reads like "narcissism disguised as altruism."[5] As if only she cares about disadvantaged students rather than the faculty whose job is to teach, supervise and shepherd our students through the program. Her particular beliefs about Rao are unwarranted and inconsistent and is based on presumptions by her and communications from an apparently angry Chris Hunn (EECS Faculty One) even in the face of what many witnesses suggest is Rao's constant advocacy for students. This is presumptive and, in part, appears to me is motivated by their view of me as a foreigner who is not sufficiently familiar with or sympathetic to American issues.

**Plausibility of other reasons for Levien's denial of data.**

There is a lot of talk about student privacy by various witnesses. But this is a diversion from the real concerns of the staff. To be sure, Levien herself and others including Kara Nelson (Witness 5, Dean of Equity and Inclusion)indicate the initial concern about the data analysis project was that it would hurt URM's.

They then shift to this notion of data privacy and FERPA.

While concerns about privacy are part and parcel of an academic enterprise, faculty are entrusted with protecting those rights by dint of our duties as teachers to produce the very educational records that are protected by FERPA. Specifically, with graduate students in EECS, all faculty have full access to the admissions database every year as well as being invited graduate student review meetings every semester. These meetings are accompanied by a spreadsheet indicating the progress of *every graduate student in the program.* The staff know this well as they prepare the non-anonymized spreadsheet, so they know that faculty are privy to every graduate student's progress. Moreover, we discuss individual issues in an open meeting which all faculty are encouraged to attend. Thus, this concern about privacy is not consistent with the access to sensitive data that faculty have and must have to do our duties. To be sure, the fact is that faculty do so with great care for student privacy as required by law. It really is just an excuse to the reservations that Levien and others feared that data analysis would harm URM students.

Also, the data was all in the department so permission from the registrar was not necessary or normal. We look at department data all the time without the involvement of the registrar. This too is a red herring.

As for FERPA, as pointed out by Witness 7, there is no violation of FERPA when sharing these data internally.

The real reason that Levien was concerned and the impetus behind her aggressive behavior is her own feelings that Rao and even the Vice Chairs of Grad matters, in general, were not sympathetic to URMS. This is false with respect to Rao and from Rao's interactions with the Grad Matter Vice-Chairs with respect to them.

We all care very much about these issues. Her belief that we don't is simply her feeling she is better than us. And, in particular, that she is better than Rao, in this respect. It is a form of superiority that is illustrated throughout her testimony where she expresses disappointment or even anger that her concerns were not properly acted on by the Vice-Chairs, the Chairs, and even the Dean for Equity and Inclusion.

To be sure, the data analysis project was never intended to use demographics or even which undergraduate university

[5] This phrase is taken from Taylor Swift's song Anti-hero.

one attended, it was about things like GPA, GRE, letter writer score assignments, and reviewer rankings. These are numerical measures that can be correlated with things like whether a graduate student passes prelims. That is what eventually was analyzed and was always the intention.

The panic that Levien went into was due to her own feelings that she is simply morally superior to the faculty in general, and Rao specifically. Its very clear in her interview where she remains unhappy with the response from the Vice Chairs, the Chairs, and even the Dean of Equity and Inclusion.

To be sure, Rao, specifically, is wary of analyzing data with demographics. He has never analyzed data where demographics or gender are relevant variables for Berkeley students. In his surveys to students, he never asks for these attributes as he feels it inappropriately introduces irrelevant attributes into his relationship with students. He believes that such analysis can be rife and has not done this with UC Berkeley students. In this regard, he shares Levien's concerns, but it is from the place of having substantial experience with these kind of analysis rather than un-informed fear from a place of superiority.

**Harm to Rao.**

From the conclusion of the analysis.

**It is undisputed that Respondent did not immediately provide Complainant with the data he requested as related to his data analysis project for the Grad Matters committee.**

The CRO suggests that the harm to Rao was the denial of data. Rao never suggested getting the data or not was the issue. He suggested being attacked as "biased" with false allegations that he advocated discriminating against URMS due to his bias and that this was done to change his job duties was the issue, not the denial of data. Indeed, several witnesses, without evidence, falsely imply Rao was inappropriately demanding data for some pet project, when Rao was simply doing what was asked of him by the Vice Chairs of the Grad Matters, despite his own reservations that it would likely not be very useful.

None of Rao's complaints suggested the harm was not getting the data. The harm is that the Chairs and Dean intimidated Rao in covering this incident up, that the staff used anonymous channels to attack Rao in retaliation, the subsequent Chair used those attacks to argue for deceleration, and that Rao was indeed decelerated losing roughly 13K in salary. Given that our retirement is based on current salary, this is a lifelong deprivation of significant resources from Rao.

Another harm, which is perhaps a greater one, is the hostile environment that Rao has faced. Several staff indicated that Rao was an advocate of students and easy to work with on projects to help them prior to this incident. Since then, they view him with hostility. To be sure, if this was resolved by everyone telling the truth in 2019, the cordial and productive relationships could have continued.

Moreover, the emotional harm of having the Chairs, Deans, and the staff intimidating and attacking Rao over this period is devastating. I will say despite denying remembering details or looking at the evidence the Chairs and Dean harbor false judgments against Rao despite the self-professed lack of knowledge. Thus the reputational harm continues.

To say that Rao was not harmed by not getting data is a diversion from the real and continuing harm that Rao alleges.

To be sure, the CRO acknowledges this:

**Further, it is undisputed that this upset Complainant and Complainant continued to be aggrieved by his belief that, in doing so, Respondent had accused him of being racist. Complainant said he likes his job, but he feels his work environment is a "culture" where he is "the enemy," and he wonders**

**if he is disliked by "every staff member" he meets. He described this feeling as "not crushing" but "difficult."**

I think it is moving to "crushing." To be sure, this falsely suggests to the reader that Rao alleged that Levien called him a racist. In fact, Rao's belief is that Levien painted him as a racist by saying he showed bias by using data to discriminate against URMs. Indeed, Levien while disagreeing that she said that specifically, she instead says she did worse: painting Rao as against Black students directly and strongly again in her interview with the CRO. So Rao's belief was well evidenced by Wawrznyek's contemporaneous testimony and confirmed at this point by the further false allegations that Levien communicated to the CRO that Rao is, for example, derogatory with respect to Black students.

**Conclusion.**

In sum, the findings in this investigation that Levien did not say Rao was biased then, is falsified by the evidence from then and indeed is falsified further by her own new allegations that Rao is specifically biased against Black students. The view this is informed by Rao's race is something that one can reasonably believe with this set of interviews. These interviews are certainly not particularly exculpatory given the ugly and false allegations that continue to be forwarded.

Sincerely

Satish Rao

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO SANTA BARBARA • SANTA CRUZ

Please Reply To: BERKELEY, CALIFORNIA 94720

Satish Rao
Professor
University of California, Berkeley
satishr@cs.berkeley.edu

December 7, 2022

Dear Vice Provost Plaut:

Please consider this a issue of the retaliation Rao faced and whether it is in response to a protected complaint under the anti-discrimination policy.

Again, we thank the Complaint Resolution Officer for their hard work on this case.

**Background**

When Rao first raised his complaint, the Chairs Demmel and Bokor were told by Vice Provost Angelica Stacy and/or Provost Ben Hermalin that Rao was not to be retaliated against for making the complaint. In particular, they were told not to remove him from committees or change any job duties. While they intimidated and implicitly threatened him, they did not change his job duties or negatively weigh in on his performance review.

When John Canny took over, defying the guidance, he removed Rao from committees due to staff anger over Rao's complaint. He furthermore bullied Rao, harassed Rao, improperly queried Rao for his caste, told Rao he was discriminating against him, and ultimately argued that Rao should be deccelerated due to the staff input which is clear from the CRO interviews is in response to his complaint about staff.

**Rao's complaint and protection against retaliation.**

Rao, as well evidenced by the interviews done by the CRO, has suffered retaliation for many years for complaining of Levien, Hunn, and Kauer's behavior which in combination painted Rao as person who discriminates. In fact, Rao does not want to harm those who are most vulnerable in our society.

In 2019, Rao raised his concerns that these accusations were based on his race to Dean Tsu-Jae King-Liu in a formal complaint thusly:

**To be sure, any accusation of racial discrimination is fraught. Indeed, given my Indian descent, I could easily feel that the behavior of Heather, Susanne, Chris, my chairs, and Provosts Stacy and Hermalin is informed by implicit bias about racial attitudes of those of Asian descent. For example, there is a history of lawsuits both at the University of California and more broadly by Americans of Asian descent that some percieve to be an attack on affirmative action. Is this why the chairs assert that I am anti affirmative action? I think my feelings of possibly facing bias in this situation has factual support, in contrast to the accusations made by staff and now the chairs against me. Still, it is difficult to know their intent. This along with the harm that comes from such an accusation to the accused and frankly the accuser suggests that they not be made lightly. In my case, the initial accusations were made with verifiably false assertions, and the followup accusations about me being anti affirmative action were made with no supporting evidence. Moreover, the anti affirmative action accusation is not relevant in our context other than its falsity and its power to smear and intimidate.**

This allegation should have been sufficient for the Dean to warn against retaliation under the anti-discrimination

policy. There is some hesitation here despite my belief that Levien's presumptions about my attitudes were based in part on my descent. Indeed, in an email to the Dean.

**Let me add, that Heather, the person who is most clearly identified with demanding that my activities be curtailed by poisioning my reputation using slander has been moved to a position that directly works with students. To be sure, this seems rife given her proclivity for slander and the fact that her slander seems to have been directed at someone of Indian descent on more than one occasion. We have many students of South Asian descent. Moreover, her move appears to have prompted my removal from the undergraduate study committee. Promoting the slanderer into a position that results in moving the person who made a complaint is textbook retaliation.**

Taken together, these should reasonably have triggered OPHD protections for Rao for an observant, sensitive, and careful leader. Indeed, the Dean should have consulted with OPHD on this matter at the time. The Dean's failure to do so does not deny the protection against retaliation to Rao as she is a responsible person. The Dean's inaction promoted staff retaliation through anonymous unspecified attacks on Rao that was then, in turn, used by Chair Canny to argue for Rao's deccelaration.

In terms of retaliation, it is clear that this happened. Rao's thanks the CRO for her statement on this:

**.. CRO acknowledges that the preponderence of the evidence supports finding that the Respondent's conduct did negatively impact Complainant at work..**

While the CRO goes on to say that does not "mean Respondent acted inappropriately." A false allegation that Rao argued against the admission of those of a certain race or ethnicity is inappropriate and moreover using this false allegation to support an accusation that Rao will "misuse data" makes it all the more inappropriate.

The complaints against Rao that perhaps Levien and others advanced to produce accusations of "unprofessional behavior" which resulted in his deccelaration at a cost in excess of 13K a year in salary also affects Rao. The spreading of these rumors which are non-specific in every sense is enormously damage and indeed the reason Rao made the complaint to the OPHD at the point in time that he did. He had to do so as his own management did not take seriously his complaint which raised the issue of discrimination.

With regards to the continuing hostile environment, Rao is dissappointed that Witnesses were interviewed without being shown Wawrznyek's statement detailing Levien's false allegations. Furthermore, when CRO interviewed faculty colleagues they remained confused and indeed seemed shocked that Rao was complaining about anything. This confusion is evident in their reactions and likely creates more problems for Rao's environment with respect to his colleagues. Indeed, asking them about Rao's disposition when faced with a notion that Rao is accusing someone of something colors their responses. Though I do understand the CRO has a responsibility with respect to balance of equities here.

While I believe, Rao has other protections under the APM against retaliation which he can pursue in the Academic Senate and in court, I further that he may also be protected from the continuing retaliation due to his raising his earnest concern that the behavior of Levien and Hunn was due to his enthicity.

Sincerely

Satish Rao

# EXHIBIT 23

Vice Provost Victoria Plaut's March 30, 2023 Notice of Decision
(OPHD Case No. 2021-UCB-00381)

Berkeley
UNIVERSITY OF CALIFORNIA

**Victoria C. Plaut**
Vice Provost for the Faculty

200 California Hall #1500
Berkeley, CA 94720
510 642-6474 phone
vplaut@berkeley.edu
vpf.berkeley.edu

March 30, 2023

Satish Rao
Professor
*Sent via email only to:* satishr@berkeley.edu

**Re: Notice of Decision - OPHD Case No. 2021-UCB-00381**

Dear Professor Rao:

Thank you for the documents you sent, which I have carefully reviewed, along with the investigation reports.

I am writing to notify you of the final decision in this matter. The Office for the Prevention of Harassment and Discrimination ("OPHD") issued the November 3, 2022 Notice of Outcome notifying you, the Complainant, that the conduct alleged in the April 29, 2022 Notice of Allegations, based on the investigator's factual findings, was not substantiated and the Respondent was found not responsible for violations of the applicable UC Nondiscrimination Policies. Following OPHD's referral, I reviewed the November 3, 2022 Report of Investigation to determine whether there are other violations of applicable policies (which the investigator made no finding about) and determined there were not.

**Final Decision**

Based on the information as laid out above, it is my decision that no further action is warranted, and this matter is now closed.

**Available Resources**

I understand that this information may seem overwhelming and that participating in a process like this can be stressful. The following resources are available to you.

Confidential Resources:

- Employee Assistance Counseling for UC Berkeley Faculty and Staff - Be Well at Work provides no cost confidential counseling and referral for UC Berkeley faculty and staff. Phone: (510) 643-7754. Email: employeeassistance@berkeley.edu.
- The Faculty Ombuds Office also provides services for faculty and can be reached at (510) 642-8788.

Additional Assistance:

- Sharon Inkelas, Associate Vice Provost for the Faculty and Special Faculty Advisor to the Chancellor on Campus Welfare, is available to you as a support and resource. She can be reached at inkelas@berkeley.edu.
- You may find additional helpful information on the OPHD website, at https://ophd.berkeley.edu.

Sincerely,

Victoria C. Plaut
Vice Provost for the Faculty

cc: Ask_OPHD@berkeley.edu

# EXHIBIT 24

Plaintiff's April 29, 2026 Request for Recusal to Chancellor's Designee Sharon Inkelas

**Satish Rao**
Professor, EECS Department
University of California, Berkeley
satishr@berkeley.edu | 510-882-5324
*Pro Se, Rao v. Regents, No. 3:25-cv-02385-LB (N.D. Cal.)*

April 29, 2026

Sharon Inkelas
Deputy Chief Ethics, Risk, and Compliance Officer
Office of Ethics, Risk, and Compliance Services
200 California Hall
University of California, Berkeley

*Sent via Electronic Mail (inkelas@berkeley.edu)*

**Re: Request for Recusal as Chancellor's Designee — Notice of Allegations dated April 24, 2026**

Dear Deputy Chief Inkelas,

I write to respectfully request that you recuse yourself from serving as Chancellor's Designee in connection with the Notice of Allegations and Referral to Committee on Charges that you issued to me on April 24, 2026, and that an unconflicted designee be appointed in your place.

**Grounds for Recusal**

I am the plaintiff in active federal civil-rights litigation against The Regents and individual UC Berkeley administrators, Rao v. Regents of the University of California, et al., No. 3:25-cv-02385-LB, currently pending before Magistrate Judge Laurel Beeler in the Northern District of California. The Court denied substantially all of Defendants' motion to dismiss the Second Amended Complaint on March 26, 2026 (ECF No. 53). The next Case Management Conference is scheduled for May 14, 2026.

Your prior involvement in events that are at issue in that pending litigation, taken together with the timing of the present referral, creates a structural conflict that should disqualify you from serving as Chancellor's Designee in this disciplinary matter.

**Specifically:**

1. **You are a percipient witness in the federal litigation.** You advised me, during the events giving rise to the federal case, that I was required to undergo reconsideration of my merit-review action before bringing the matter to the Privilege & Tenure Committee. That direction is part of the procedural sequence at issue in the federal case.

2. **You had a supervisory relationship with another percipient witness in the federal case.** Karie Frasch of the Office of Faculty Equity & Welfare consulted with my then-Department

Chair, David Wagner, regarding my complaints during the events giving rise to the federal case. Ms. Frasch is identified as a witness in my Initial Disclosures in the federal case. To my understanding, you supervised Ms. Frasch in the relevant period.

3. **Timing of the present referral.** The April 24, 2026 Notice was issued approximately three weeks after I sent a written settlement letter to Defendants' counsel for distribution to the individual defendants in the federal case, and approximately one month after the favorable ruling on Defendants' motion to dismiss. The events underlying the allegations occurred in 2024 and were known to and reviewed by multiple University offices at that time — including the Center for Student Conduct, the Committee on Course of Instruction, the Faculty Grievance Committee, and the Academic Senate — none of which referred the matter to the Vice Provost for the Faculty for misconduct review during the intervening two years.

4. **Appearance of impropriety.** Without addressing the underlying allegations at this time — which I will respond to separately at the appropriate time — the combination of (a) your prior involvement in events at the heart of my federal lawsuit, (b) your supervisory connection to another federal-case witness, and (c) the timing of the present referral relative to federal-litigation milestones creates an appearance of impropriety that the Faculty Code of Conduct process should not tolerate.

**Relief Requested**

I respectfully request that:

- You recuse yourself from serving as Chancellor's Designee in this matter;
- An unconflicted designee, with no prior involvement in the events at issue in the federal litigation and no supervisory relationship to witnesses in that case, be appointed in your place;
- The unconflicted successor designee conduct an Intake and Initial Assessment in accordance with Section V.A of the UC Berkeley Procedure for the Resolution of Senate Faculty Misconduct Complaints, including, in particular, contacting me as the Respondent to develop sufficient information for the prima-facie assessment. The April 24, 2026 referral to the Committee on Charges was made without any such contact;
- The unconflicted successor designee, before initiating any formal investigation under Section V.C.2, give due consideration to Section V.C.1 (Administrative Closure with possible preventive education) as a resolution, in accordance with the institution’s procedure;
- Pending the appointment of an unconflicted designee, you take no further substantive action in this matter, including but not limited to additional communications with the Committee on Charges or with witnesses;
- All records, communications, and notes related to this matter — including, without limitation, communications between or among yourself, any complainants or reporters, the Committee on Charges, and any other University personnel — be preserved in their original form, and that an appropriate litigation hold be implemented.

**Confidentiality and Sharing of the Notice**

I note that your April 24, 2026 Notice is marked "IN STRICT CONFIDENCE / CONTENTS FOR ADDRESSEE ONLY." I do not accept this unilateral designation as preventing my sharing of the Notice with: (i) personal counsel and any advisor or confidential resource I consult regarding this matter, including those identified in the Notice itself; (ii) counsel and the federal court in my parallel federal litigation, to the extent relevant; (iii) other persons whose involvement is reasonably necessary to my defense; and (iv) appropriate oversight bodies, regulators, or other recipients of protected disclosures, to the extent disclosures relating to this matter are protected under California Government Code § 8547, California Labor Code § 1102.5, the First Amendment, or other applicable law. The Notice's own provision contemplating respondent advisors implicitly recognizes the necessity of at least some such sharing. I will exercise appropriate discretion regarding the privacy interests of any third parties named in the Notice, including by redacting student names. Subject to that, I reserve all rights regarding sharing for legitimate advisory, representational, litigation, and protected-disclosure purposes.

**Request for Procedural Information**

Separate from the recusal request, and to facilitate appropriate engagement with the Committee on Charges process going forward, I respectfully request the following procedural information:

- **Committee membership and conflicts:** the names and affiliations of the Committee on Charges members currently considering this matter, and confirmation that no member has a conflict of interest with respect to me or the events at issue, including any current or former role relevant to the federal litigation, supervisory or working relationships with witnesses in that litigation, or personal involvement in the events giving rise to either matter;
- **Process and timeline:** the procedural schedule the Committee on Charges will follow, including (a) whether the Committee intends to request an interview; (b) the timeline for the Committee's draft report; (c) the procedural mechanism by which I may submit written materials in advance of or contemporaneously with the Committee's deliberations; and (d) the standard the Committee will apply in its probable-cause assessment;
- **Documents and evidence:** confirmation of which documents and other materials have been provided to the Committee on Charges, and confirmation that I will have an opportunity to review and respond to all materials the Committee considers.

**Reservation of Rights**

Nothing in this letter constitutes any admission, denial, or substantive response regarding the allegations described in the April 24, 2026 Notice. I will respond to the substance of those allegations at the appropriate time and through appropriate procedures, once the issue of the proper designee is resolved. I expressly reserve all rights, including the right to raise additional objections, to seek leave to introduce evidence of the present referral and the surrounding circumstances in the federal litigation, and to amend my federal complaint as appropriate.

Please confirm receipt of this request. I look forward to your written response.

Thank you for your attention to this matter.

Respectfully,

**Satish Rao**
Professor, EECS Department
*Plaintiff, Pro Se, Rao v. Regents*

*cc: faculty-conduct@berkeley.edu*